Donald F. BAKER, Plaintiff,

v.

Henry WADE, District Attorney of Dallas County, Texas, in his official capacity; and Lee Holt, City Attorney of Dallas, Texas, in his official capacity; and the Class of all City, County and District Attorneys in the State of Texas, in their official capacities, Defendants.

Civ. A. No. 3–79–1434–R.

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 17, 1982.

1124

James C. Barber, Dallas, Tex., for plaintiff.

Charles Baldree, Asst. Dist. Atty., Joseph G. Werner, Kent S. Hofmeister, Asst. City Attys., Dallas, Tex., for defendants.

## MEMORANDUM OPINION

BUCHMEYER, District Judge.

This is a suit by a homosexual, Donald F. Baker, attacking the constitutionality of § 21.06 ("Homosexual Conduct") of the Texas Penal Code. Section 21.06 (and the related definitions in §§ 1.05 and 21.01) provide:

> "A person commits an offense if he [or she] engages in deviate sexual intercourse with another individual of the same sex.
>
> "'Deviate sexual intercourse' means any contact between any part of the genitals of one person and the mouth or anus of another person."

A violation of this statute is a "Class C misdemeanor," punishable only by "a fine not to exceed $200." Tex.Penal Code Ann. § 12.23 (Vernon 1974).

The defendants contend that § 21.06 is constitutional because it furthers the state's interests in protecting "morality, decency, health, welfare, safety, and procreation"— but, despite these important state interests, they also claim that the case should be dismissed because no one is ever prosecuted under this statute.

There have been (and will continue to be) prosecutions of both homosexuals and heterosexuals—*under Texas Penal Code provisions not involved in this suit*—for such

sexual offenses as (i) rape and sexual abuse by force, §§ 21.02 and 21.04; (ii) indecent exposure or public lewdness, §§ 21.07 and 21.08; and (iii) rape, sexual abuse or fondling of a child, §§ 21.09–21.11.

However, § 21.06 does not concern rape, sexual abuse by force, offenses involving minors, or sexual conduct in public. Nor does it prohibit sodomy between a husband and wife or between an unmarried male and female. Instead, it condemns only homosexual conduct done in private between consenting adults. Accordingly, it is unconstitutional because it violates both the fundamental right of privacy and the right to equal protection of the laws guaranteed to the plaintiff (and other homosexuals) by the United States Constitution.

This opinion will first discuss the procedural background of the controversy, the sodomy statute involved, and the facts established at trial (pages 1125–1134). Then, it will analyze the legal issues of right of privacy and equal protection (pages 1134–1145). Finally, it will deal with several additional matters raised by the parties (pages 1145–1147), and conclude by describing the exact limits of this decision (pages 1147–1148).

## The Procedural Setting

The complaint seeks a declaration that § 21.06 (Homosexual Conduct) of the Texas Penal Code is unconstitutional because it violates (i) the plaintiff's fundamental right to privacy, (ii) the equal protection clause of the fourteenth amendment, and (iii) the establishment of religion clause of the first amendment.

It named as defendants Henry Wade, District Attorney of Dallas County ("Dallas County") and Lee Holt, City Attorney of Dallas, Texas ("City of Dallas")—but also sought a defendant class, under Fed.R. Civ.P. 23(b)(2), consisting of "all district, county and city attorneys in the State of Texas responsible for the enforcement of Texas Penal Code Ann. § 21.06." After the State of Texas intervened, the parties agreed that such a defendant class was proper. A consent certification order was entered, and the Court reaffirms its determination that the defendant class was properly certified.[1]

## The Statute

Texas has had three sodomy statutes. See Appendix A ("The Texas Sodomy Laws").

The first was enacted in 1860. It prohibited "the abominable and detestable crime against nature" (punishable by 5–15 years imprisonment). However, this statute did not condemn oral sex, but only anal sex and bestiality.[2] Thus, for a period of 83 years, oral sodomy was not illegal in Texas—whether committed by man and wife, by unmarried male and female, or by homosexuals.

The second statute was Article 524, Texas Penal Code Ann., adopted in 1943. It prohibited "carnal copulation" with human or beast (punishable by 2–15 years imprisonment), and condemned *all* oral and anal sex and bestiality. Thus, for the next 31 years, it was a felony for *anyone* in Texas—mar-

1. The four requirements of Rule 23(a)—"numerosity, commonality, typicality and adequacy"—have been met. There are several hundred public prosecutors in Texas who have jurisdiction to enforce § 21.06. Plaintiff's claims against the named defendants are common to and typical of his claims against the defendant class—that they all enforce an unconstitutional law and that, during his regular travels throughout the state, he faces the threat of prosecution under § 21.06. Defendants Holt and Wade are adequate representatives of the class, and no conflicts exist between them and other class members. In addition, approximately 40 district, county and city attorney's offices (including those in major metropolitan areas) were advised by defendant Holt that they should intervene in this suit by September 1, 1980, but none of them chose to do so. The members of the class act on "grounds generally applicable to the class" in enforcing a law claimed to be unconstitutional, making final injunctive relief appropriate "with respect to the class as a whole." Accordingly, the defendant class was properly certified under Fed. R.Civ.P. 23(a) and 23(b)(2).

2. See Appendix A; *Pruett v. State,* 463 S.W.2d 191 (Tex.Cr.App.1971), appeal dismissed for want of substantial federal question, 402 U.S. 902, 91 S.Ct. 1379, 28 L.Ed.2d 643 (1971).

ried couples, single males and females, male homosexuals or lesbians—to engage in oral or anal sodomy, even in private with another consenting adult.[3]

The third statute, § 21.06, was passed in 1974 as part of the first comprehensive reform of the state's criminal laws since the initial penal code had been enacted in 1856. It prohibited only homosexual sodomy. All prohibitions against oral or anal sex between consenting adults of opposite sex, whether married or not, were rescinded (as were criminal laws against fornication and adultery). Thus, for the past 8 years in Texas, only homosexuals have been prohibited from engaging in private, consensual sodomy (although punishment was drastically reduced by § 21.06, with no imprisonment and a maximum fine of $200). At least three sessions of the Texas legislature have rejected attempts to repeal § 21.06, and this is the first *direct* constitutional attack upon it.[4]

There are practical difficulties in prosecuting persons under § 21.06 for private homosexual conduct. If the acts are between two people in private, there may be no witness to testify at trial. Moreover, "the consenting parties to acts of sodomy are equally guilty and their testimony as witnesses for the state would require corroboration."[5]

However, homosexuals have in fact been prosecuted under the Texas sodomy statutes.[6] And, the parties in this case stipulated in the final pretrial order that the plaintiff is "an admitted practicing homosexual"; that he has not been arrested or prosecuted for a violation of § 21.06; but that cases involving violations of this statute "have been prosecuted by various assistant city attorneys and assistant district attorneys" in Dallas; and that both defendants "would prosecute the plaintiff and other homosexuals under § 21.06 if a provable violation of the law came to their attention."

*The Facts*

The following summary of the testimony of the plaintiff, the plaintiff's experts, and the defendants' witnesses constitutes this Court's findings of fact under Fed.R.Civ.P. 52(a).

### the plaintiff

Donald F. Baker, 35, is a former Dallas school teacher who received his master's degree in education from Southern Methodist University in 1980. He has never been arrested or convicted of any criminal offense. He is an active and devout Christian. And, he is a good citizen, having served as precinct chairman and as a delegate to two state Democratic Party conventions.

But Donald Baker is a homosexual. He has never had sex with a woman, or even been sexually aroused by a female. He does engage in private sexual acts with other adult males, but is not capable of doing so with females. Therefore, *Donald Baker is also a criminal* under § 21.06 of the Texas Penal Code.

---

**3.** As discussed in Appendix A, this statute (Article 524) was held unconstitutional by a three-judge federal court, *Buchanan v. Batchelor,* 308 F.Supp. 729 (N.D.Tex.1970), reversed and remanded on other grounds, 401 U.S. 989, 91 S.Ct. 1222, 28 L.Ed.2d 526 (1971)—but the Texas Court of Criminal Appeals declined to follow this decision and held that Article 524 was constitutional, *Pruett v. State,* 463 S.W.2d 191.

**4.** See Appendix A; *Cyr v. Walls,* 439 F.Supp. 697 (N.D.Tex.1977); *Childers v. Dallas Police Dept.,* 513 F.Supp. 134 (N.D.Tex.1981), affirmed without opinion, 669 F.2d 732 (5th Cir. 1982).

**5.** *Pruett v. State,* 463 S.W.2d at 193. Apparently, no married couples were ever prosecuted under Article 524 because of these reasons—and also because "neither spouse would be competent to testify against the other by reason of their relationship as husband and wife" (463 S.W.2d at 193).

**6.** *See, e.g., Buchanan v. Batchelor,* 308 F.Supp. 729. David Rosen, a former assistant city attorney, testified that a case could be prosecuted under § 21.06 if a "credible" witness observed the private acts of sodomy. Also, § 21.06 might be used by the state if there is some doubt about whether the acts of sodomy occurred "in a public place" under § 21.07 (Public Lewdness).

Baker was a very sincere, very credible witness.[7] While his parents listened in the courtroom, Baker gave the following testimony about his adolescent ignorance of his homosexuality, his disgust and self-loathing upon recognition of it, his isolation and suffering, his suicidal tendencies, and his eventual change from a "homosexual" into a "gay."[8]

Baker was born on April 24, 1947, into a very stable and religious family in Dallas. His grandfather had been an Assembly of God minister, and Baker was very active in this church. He was a leader in various youth activities, including the church choir and the boy scouts. During his junior high school years, when Baker was 13 or 14, he started to become aware that he was somehow "different." Although he dated some girls because of peer pressure, he found this awkward. He began realizing that he had strong feelings for his male friends, but could not understand his frustration and loneliness. He knew that "queers were bad," and had no idea that he might be homosexual.

In 1965 Baker graduated from high school and attended East Texas State University. There, he became even more aware that he was "different." He did "some study" of the "general area of homosexuality," and learned it was illegal. He grew very disappointed in himself, and simply could not understand why he was having feelings that were "wrong" and "criminal" and "sinful."

After two years at East Texas (1965–67), Baker transferred to the University of Texas at Austin. There, he continued his church activities and worked at a campus bookstore. He had never engaged in any homosexual conduct and still did not know he was homosexual. Then, in November of 1967—when Donald Baker was 20—he had his first homosexual "experience."

On that day, Baker took a break from work at the bookstore to watch a football game on television in the student union. The room was crowded and Baker soon became aware of a man standing next to him. After a while, Baker looked up, and the man—blond, early twenties, medium height—was staring at Baker, with a look that was "erotic." Baker felt intense anxiety and attraction. He followed the man to the rest room, but nothing happened. Baker refused the man's advances, and returned to work, where he broke into sobs.

Baker was overwhelmed with fear and with disgust. He knew his desires for sexual contact with the man were wrong, and were contrary to his family and religious values. Baker felt he was a "dirty, nasty thing." He left work, and went to sing in the church choir, but broke down there, too. He tried to talk to his minister, but could not bring himself to tell the minister what was really wrong.

After that day, Baker cut himself off from the world. He refused to open the door to his room or answer the phone for over two weeks. Baker was afraid he had a "disease" and might contaminate others. He was sure that "God hated him" and that "society hated him" and that "his family hated him." In May of 1968, Baker joined the Navy because "he needed to run away from what he was."

Baker had not engaged in any homosexual conduct while in college, nor would he do so while he was in the Navy. He served in the Navy for four years (1968–72), with an excellent record. During this time, Baker continued to attend church and agonized about "what he was." He knew that if he

---

7. Although people tend to stereotype homosexuals, just as they do corporate executives and truck drivers, "contrary to the frequently held notion that all homosexuals are alike, they are in fact very heterogeneous." National Institute of Mental Health Task Force on Homosexuality, p. 2 (Oct. 1969) (admitted as plaintiff's exh. 21 and hereinafter cited as "Task Force on Homosexuality"). During trial, Donald Baker dressed conservatively, was very articulate, and had the appearance that most people might expect of a school teacher or bank executive.

8. According to Baker, a "homosexual" is one who has an emotional, erotic attachment to one of the same sex—while a "gay" is one "who is proud of being a homosexual." *See Cyr v. Walls*, 439 F.Supp. 697, 699 n. 2.

was homosexual, then "he wouldn't have a job, his family would reject him, and he would burn in hell." Baker prayed for deliverance.

In January of 1972, Baker was honorably discharged. He came home to Dallas, but had a "terrible fear," and left after only two weeks to live with friends in Massachusetts. During the next two years, Baker felt isolated and rejected—his suffering and disgust continued—and he seriously considered suicide. Baker still had not engaged in any homosexual conduct. In 1974, he enrolled at the State University of New York in Cortland, continuing his studies in elementary and secondary school education (graduating cum laude in 1975).

One day Baker decided to attend a meeting of a gay organization at Cornell University in Ithaca, thirty miles away. He was nervous, and walked around the Cornell campus for about an hour. Finally, he sneaked into the building, and stood hidden on a balcony where he could see the meeting down below. It was the first time Donald Baker had ever seen other human beings that he knew were homosexual, too, but who were not ashamed of that fact.

At age 27, Donald Baker was starting "to come out of the closet." He became acquainted with other "gays," and "learned that that they were not monsters." During the next year, he studied history, sociology and psychology; he re-examined the Bible and satisfied himself that he could be a devout Christian as well as a homosexual; and he gradually "came to terms with the fact that he was homosexual," although he was still discreet in telling others.

In 1975, Baker returned to Dallas and "came out" to his family, admitting to them that he was homosexual. He obtained a job with the Dallas Independent School District, and taught there for four years (1975–1979) as a language arts and social studies teacher in grades 4–6. His private life as a homosexual did not adversely affect his job performance or his abilities as a teacher.[9] Indeed, Baker was recognized by DISD as an excellent teacher.[10] And, when Baker left DISD in 1979 to return to Southern Methodist University to work on his master's degree, the School District recommended him for the teaching fellowship which he was awarded.

Before completing his master's degree, Baker became actively involved in gay rights organizations. In 1979, he became Vice-President of the Dallas Gay Political Caucus and, in November of that year, this suit was filed. In 1980, the name of the organization was changed, and Baker became President of the Dallas Gay Alliance. He is also active on state and national levels.[11]

Baker also testified that he will continue to engage in private homosexual conduct in violation of § 21.06, but has no intention of doing so in public . . . that he does not desire or need psychiatric treatment . . . that § 21.06 does have serious effects upon homosexuals because it makes them criminals . . . that this "stigma" encourages police harassment of homosexuals and results in discrimination against homosexuals by employers, apartment owners, domestic relations courts (in child custody matters), and others.

9. During the period he taught at DISD, Baker did engage in sexual conduct with other males in private at his home. However, he was never sexually attracted to any students and never had any sexual contact with them. He did not advocate homosexuality to the students. Instead, he lived in fear and anxiety of being "discovered"—because the DISD Superintendent had stated publicly that he would fire any homosexual teachers. A school board member testified that Baker would have been fired if there had even been a suspicion that he had violated § 21.06.

10. Baker's evaluations included these comments: "Mr. Baker is an asset to our school. He has done a good job for us this year. Potential of being an excellent teacher" (1976) . . . "An excellent teacher. He is well liked by students, parents, and co-teachers" (1977) . . . "He has done a good job. He is becoming an excellent teacher, a hard and dedicated worker" (1978). See plaintiff's exh. 1.

11. Baker travels frequently throughout the state in connection with these activities—particularly to Houston and Austin—and, consequently, would be subject to prosecution under § 21.06 in other cities besides Dallas.

### the plaintiff's experts

The two principal expert witnesses [12] presented by the plaintiff were Dr. Judd Marmor, a psychiatrist, and Dr. William Simon, a sociologist. Both had studied and written extensively in the area of homosexuality and they are experts in this field. Their qualifications were impeccable (see plaintiff's exhs. 2, 4) and their testimony established the following facts:

Section 21.06 makes "criminals" of a substantial number of individuals in Texas. At least 5% of American males are "exclusive" or obligatory homosexuals [13]—who have no heterosexual experiences and who have no desire to change. This means that there are at least 500,000 exclusive homosexual males in Texas. In addition, some 2–3% of the females in Texas (or, approximately 130,000–200,000) are exclusive lesbians.[14]

These "exclusive homosexuals" did not choose to be homosexuals. Obligatory homosexuality is not a matter of choice: it is fixed at an early age—before one even begins to participate in sexual activities—and only a small minority can be changed or "cured," if at all. Although there are different theories about the "cause" of homosexuality, the overwhelming majority of experts agree that individuals become homosexuals because of biological or genetic factors, or environmental conditioning, or a combination of these and other causes—and that sexual orientation would be difficult and painful, if not impossible, to reverse by psychiatric treatment.

Indeed, homosexuality is not a "disease" and it is not, in and of itself, a mental disorder.[15] Although society—and courts—

12. Through another expert, Dr. Victor Furnish, a theologian and professor of the New Testament at S.M.U. (plaintiff's exh. 3), the plaintiff introduced a number of resolutions by church bodies condemning the repression of homosexuality and urging repeal of statutes like § 21.06 (plaintiff's exh. 10). Dr. Furnish testified that, in his expert opinion, the Bible does not condemn *consensual* homosexual conduct. He noted that there is no reference to homosexuality in the Ten Commandments; that Christ made no statements about homosexuality; and that homosexuality was not a "prominent biblical concern" since it is the subject of only a few passages. Dr. Furnish interpreted the story of Sodom as an "intended gang rape" of the strangers (the two angels in Lot's house), and thus a condemnation of violence and force, not consensual homosexual conduct. He gave a similar interpretation to the two passages in Leviticus—*Leviticus* 18:22: "Thou shalt not lie with mankind, as with womankind: it is abomination." *Leviticus* 20:13: "If a man also lie with mankind, as he lieth with a woman, both of them have committed an abomination: they shall surely be put to death; their blood shall be upon them"—and also noted that neither the Bible nor these passages "say anything about female homosexuality." However, Dr. Furnish conceded that other biblical scholars may disagree with his opinions and that, in fact, many religions do condemn homosexuality.

13. Under the "Kinsey scale,"—which begins with category 0 (exclusively heterosexual)—category 6 is "exclusively homosexual" (no heterosexual experiences, obligatory) and category 5 is "more or less exclusively homosexual" (only incidental heterosexual experiences, with no desire to change, obligatory). The figures given in this opinion are for categories 5 and 6, combined, since these are considered "exclusive homosexuals." However, among the 95% of American males who are not "exclusive homosexuals," 15–20% do engage in some homosexual activities. For example, individuals whose heterosexual preference is predominant may, under certain circumstances (such as imprisonment), become involved in homosexual behavior. See Task Force on Homosexuality, p. 2 (plaintiff's exh. 21) (Dr. Judd Marmor was a member of this Task Force and helped write the report).

14. These numbers may be even higher. According to the magazine article introduced as Defendant Wade's Exhibit 1, the revolutionary Kinsey survey—which revealed a surprising level of homosexual behavior not previously known and which has been confirmed by later studies—estimated that 10% of the American men, and approximately 3–5% of the women, were exclusively homosexual. This would mean that there may be over 650,000 exclusive homosexual males and as many as 200–300,000 exclusive homosexual females in Texas. Kinsey also estimated that 50% of all American males have had homosexual experiences. Ennis, "What Do These Rugged Texas He-Men Have in Common?," Texas Monthly (June 1980), pp. 107–113, 209–226 (hereinafter cited as "Texas Monthly"). The plaintiff testified that the statements made about him in this article were basically correct.

15. Dr. Marmor testified that homosexuality was not "contagious" or infectious; that, although there was "some disagreement," almost

may still grapple with this question, in 1973 the American Psychiatric Association removed homosexuality from its list of psychic disorders, resolving that "homosexuality per se implies no impairment in judgment, stability, reliability or general social or vocational capabilities" and that *"in the reasoned judgment of most American psychiatrists today, homosexuality per se does not constitute any form of mental disease"* (plaintiff's exh. 5). In 1970, 1973 and 1975, respectively, the American Anthropological Association, the American Bar Association,[16] and the American Psychological Association adopted similar resolutions (plaintiff's exhs. 6, 8, 9). And, in 1975, even the American Medical Association resolved (plaintiff's exh. 7):

> "That the American Medical Association support in principle repeal of laws which classify as criminal any form of non-commercial sexual conduct between consenting adults in private, saving only those portions of the law which protect minors, public decorum, or the mentally incompetent."

Each of these resolutions urged the repeal of statutes which, like § 21.06, prohibit only private sexual conduct by consenting adults. If this were done—i.e., if there was a "decriminalization" of homosexual acts in private by consenting adults—this would not result in an increase in homosexuality. In some countries (e.g., England, France, Holland, Finland), homosexual conduct has been decriminalized for years, and there is no greater incidence of homosexuality in those countries than in the United States. Moreover, there have been no adverse side

effects in the 21 states that have now decriminalized consensual sodomy between adults in private.[17]

There is no basis to assume that criminal laws (like § 21.06) reduce the number of homosexuals. Persons do not choose homosexuality, and only a small percentage of exclusive homosexuals can be cured or changed. Criminal sanctions do not deter homosexual sodomy—because "sex, next to hunger and thirst, is the most powerful drive that human beings experience," and it is unrealistic to think that such laws will force total abstinence. Moreover, homosexuality has never been stamped out by criminal laws; it has been common in almost every type of society, at all economic levels and among all ethnic and cultural groups.

In addition, the existence of these criminal laws, even if they are not enforced (like § 21.06), does result in stigma, emotional stress and other adverse effects. The anxieties caused to homosexuals—fear of arrest, loss of jobs, discovery, etc.—can cause severe mental health problems. Homosexuals, as criminals, are often alienated from society and institutions, particularly law enforcement officials. They do suffer discrimination in housing, employment and other areas.

Neither Dr. Marmor nor Dr. Simon could find any legitimate state interest to justify statutes like § 21.06. Although "homophobia"—an exaggerated fear of homosexuals—may exist among many heterosexuals, there is no rational basis for this. The vast majority of sex crimes committed by adults upon children are heterosexual, not homosexual.[18] Homosexuals do not have a crimi-

all American psychiatrists feel that "homosexuality per se does not constitute any form of mental disorder"; and that there is no respected medical literature to the contrary.

16. The American Law Institute in its Model Penal Code recommended that criminal statutes covering sexual conduct "be recast in such a way as to remove legal penalties against acts in private among consenting adults." *See* Task Force on Homosexuality, p. 6 (plaintiff's exh. 21); *Buchanan v. Batchelor,* 308 F.Supp. 729, 732 (N.D.Tex.1970), rev'd on other grounds *sub nom. Buchanan v. Wade,* 401 U.S. 989, 91 S.Ct. 1222, 28 L.Ed.2d 526 (1971).

17. The 21 state statutes are attached to the plaintiff's "Motion That Judicial Notice Be Taken of Certain State Sodomy Laws." *See also* Rivera, "Our Straight-Laced Judges: The Legal Position of Homosexual Persons in the United States," 30 Hastings L.J. 799, 950–51 (which indicates that 22 states have passed such "decriminalization" statutes).

18. *See* "Responding to Child Sexual Abuse: A Report to the 67th Session of the Texas Legislature" (Sam Houston State Univ., Criminal Justice Center 1980) (introduced as plaintiff's exh. 12).

nal propensity simply because they are homosexuals, any more than heterosexuals do. Homosexuals are not ill or mentally diseased. And, homosexuality in society does not adversely affect the growth and development of children.[19]

Accordingly, both of the plaintiff's experts felt there was no rational basis and no state interest that would justify § 21.06. The Court credits the testimony and the opinions of Dr. Marmor and Dr. Simon, particularly since they were uncontradicted —except, as next discussed, by *part* of the testimony of the defendants' "expert."

### the defendants' witnesses

The defendants presented Dr. James Grigson, a psychiatrist primarily engaged in what he termed "legal psychiatry," [20] as an expert witness. It was his opinion "that the members of society, including the homosexual individuals, do benefit from the law [against homosexual conduct] which we have here in the state of Texas." He did not explain how "members of society" benefited from § 21.06, but testified specifically that it was helpful to children and to homosexuals because:

(i) As to *children,* § 21.06 "primarily reinforces their own super-ego or conscience" and thus fosters their "growth and development" by reinforcing "the culture of society's norm pattern or expected pattern of behavior."

(ii) As to *homosexuals,* "if sodomy was decriminalized, it would be harmful to the homosexual, because it would result in a lessening in terms of those individuals going ahead and seeking help and resolving their problems."

Dr. Grigson also testified that, in his opinion, homosexuals "are less stable and have more pathological emotional mental illnesses than the general population as a whole" —and that "homosexuality is an illness and a disease and that certainly homosexual behavior is deviant behavior." [21]

This Court completely discounts Dr. Grigson's testimony and his opinions.[22] These opinions were not based upon any independent research or supported by "any respected medical or psychiatric literature." Indeed, Dr. Grigson had personally treated only 40–50 homosexuals in his 19–year practice (although he had seen "a far larger number" just for the purpose of doing eval-

19. Dr. Marmor was cross-examined about a statement he made in the book *Sexual Inversion* that "Psychiatric intervention is prophylactically indicated for children or adolescents who seem to be failing to make appropriate gender role identifications." He explained that sexual preference is fixed at an early age (probably before age 6), and that "highly effeminate children"—who are vilified by their peers and badly traumatized "in a society that regards homosexuality as an undesirable behavioral deviation"—may benefit from psychiatric treatment. His explanation was credible, and his testimony as a whole clearly established that the normal growth and development of children was not fostered by laws which make homosexual conduct illegal.

20. Dr. Grigson explained that "legal psychiatry" revolves around "determination of competency, sanity, likelihood of making probation of defendants, occasional civil cases involving psychiatric questions, occasional probate cases involving competency of an individual to make a will." He spends about 20% of his time testifying on behalf of the District Attorney's office in criminal cases, and appeared in over 100 criminal cases in *each* of the past four years (1977–1980), an average of three times

per week. Dr. Grigson also teaches psychiatry part-time at Southwestern Medical School in Dallas.

21. Accordingly to Dr. Grigson, this is true of *all* homosexuals, not just exclusive or obligatory homosexuals; "regardless of whether they want [heterosexual relationships] or don't want them, they're still, if they are homosexual, suffering from an illness."

22. In making this determination, this Court has—in addition to the matters discussed above—considered all of the circumstances under which the witness testified, including his relationship to the District Attorney's office (see note 20) and the extent to which he was supported or contradicted by other credible evidence. No weight was given to the fact that Dr. Grigson had been reprimanded by the American Psychiatric Association on a collateral matter. *See Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). There was nothing to show that Dr. Grigson was not a competent psychiatrist; however, he was not a credible witness concerning homosexuality and laws condemning homosexual conduct.

uations on them)[23]—and he could not name any other psychiatrist who shared his opinion "that homosexuality or private homosexual conduct between consenting adults ought to be criminalized."

Moreover, Dr. Grigson's opinions were directly contrary to those of the plaintiff's experts[24]—whose qualifications as experts in the field of homosexuality were outstanding and whose testimony was very credible—and to positions adopted by various medical and psychiatric associations. For example, Dr. Grigson disagreed with the American Psychiatric Association resolution that "homosexuality per se does not constitute any form of mental disease"—and with the American Medical Association resolution supporting "repeal of laws which classify as criminal any form of non-commercial sexual conduct between consenting adults in private." And, even standing alone, Dr. Grigson's "opinions" were flawed, inconsistent, and directly contrary to other credible evidence accepted by this Court:

(i) As to *children,* Dr. Grigson conceded that their "normal growth and behavioral patterns" are reinforced by their "parents, school, religion and churches"—but did not even attempt an explanation as to why criminal sanctions against homosexuality would also be needed to reinforce children's "super-ego or conscience." Moreover, it is a fact under the evidence in this record (Fed.R.Civ.P. 52) that "sexual preference is fixed at a very early age," probably before the age of six, and that people do not "choose" to become homosexuals. Thus, there is no basis for Dr. Grigson's opinion—which is contrary to the medical literature and the opinions of "most American psychiatrists today"—that children might become homosexuals or develop homosexual tendencies unless homosexual conduct is illegal and punished by a $200 fine.[25]

(ii) As to *homosexuals,* the idea that criminal sanctions will cause such anxieties in homosexuals that they will seek psychiatric treatment and be "cured" is not only preposterous[26]—it, too, is contrary to the facts established by the credible evidence in this record (Fed.R.Civ.P. 52): persons do not choose to be homosexuals; most "exclusive homosexuals" do not want to be changed and do not seek any treatment; the "cure rate" for all homosexuals will, at best, be only 30%;[27] and criminal laws simply do not reduce the number of homosexuals in society.

In contrast to Dr. Grigson, neither of the two defendants—District Attorney Henry Wade and City Attorney Lee Holt—could even attempt to explain how § 21.06 furthers the state's interests in protecting decency, the welfare of society, procreation, morality, or any other interest. Wade testified (by deposition):

"... Can you explain to me how this law furthers the state interest of *decency,*

23. Dr. Grigson was tendered as an expert because of his experience in diagnosis and treatment "of sexual disorders or conditions relating to sexual problems," including the diagnosis or treatment "of individuals who had problems relating to homosexuality."

24. Dr. Grigson, again without any support, (i) disagreed with the plaintiff's experts that "sexual preference is fixed at a very early age," and thought that many individuals changed their sexual preferences "around puberty" or even "in later life," and (ii) disagreed that homosexuality "is a condition that is virtually unchangeable, at least in approximately 70% of the homosexual population."

25. Dr. Grigson did testify that it "could be extremely harmful in terms of their sexual identification" for children to observe "homosexuals behaving in a sexual way." However, this could be prohibited—if it is not already—

by specific, limited statutes dealing with sexual abuse and children. *See* Tex.Penal Code Ann. §§ 21.09–21.11 (Vernon 1974).

26. Even the most severe criminal penalties—including death in some countries—have not ended homosexuality. The maximum penalty for homosexual conduct under § 21.06 is only a $200.00 fine—and Dr. Grigson did think "there would be more people who would be seeking treatment if the penalties were greater."

27. The Task Report on Homosexuality, p. 5 (plaintiff's exh. 21) indicates that "the current literature suggests that perhaps *one-fifth* of those exclusively homosexual individuals who present themselves for treatment are enabled to achieve some heterosexual interests and competence if they are motivated to do so."

if any, by prohibiting private homosexual conduct but permitting private heterosexual conduct that constitutes deviate sexual conduct, as defined by the statute?

"A. No.

"Q. You also indicate ... that one of the purposes of this law is to further the *welfare of society*. And what I'd like to know is what kind of societal welfare is furthered by a law that intrudes into the bedroom of consenting sexual adults?

"A. I don't know of any. There may be some.

"Q. And I take it since you don't know of any, you don't know how it's furthered by the statute?

"A. No.

"Q. Do you know how this statute furthers the *welfare of society* by prohibiting homosexual sodomy but permitting heterosexual sodomy?

"A. No.

" . . .

"Q. And can you explain to me how this statute furthers the state interest, if any, in *procreation* by permitting heterosexual sodomy, but prohibiting homosexual sodomy?

"A. I didn't even know it permitted either one.

"Q. What it does on its face, for your information, is prohibits private deviate sexual intercourse between persons of the same sex, but by its very language and also by your answers to discovery, you've admitted that it does not prohibit private deviate sexual intercourse by members of a different sex.

"A. I don't think procreation is involved in either one of them; is it?

" . . .

"Q. How does this law further *morality* of society by prohibiting private homosexual sodomy but permitting private heterosexual sodomy?

"A. I don't really know."

City Attorney Holt also testified (by deposition) that he had no knowledge of any way in which "private consenting homosexual conduct frustrates procreation" or protects the "morals" of society.

But both Wade and Holt felt the legislature "must" have had some public interest in mind or they would not have passed § 21.06. District Attorney Wade testified:

"Q. In your candid opinion with 30 years experience as a prosecutor, public prosecutor in Dallas County, do you know of any public interest, *any public interest*, period, furthered by this statute?

"A. Well, I think the legislature wouldn't have passed it if there wasn't a public interest in it.

" . . .

"Q. You also indicate in your answers that one legally, or one state interest that is furthered by the statute is one of 'morals.' What state interest, if any, is there in the morality of private sexual conduct that you know of?

"A. The only thing I know, the legislature, after hearings, passed a law against it. I assume they had some public interest in it or they wouldn't have passed it."

Similarly, City Attorney Holt testified that the "legitimate interest" would have "to be for others to say because I think it has to be determined from the intent of the legislature and those to whom they looked for advice in passing these laws."

However, no legislative history is available (see Appendix A) to assist the Court in determining the intent of the legislature in passing § 21.06—i.e., why the penalties against oral and anal sodomy between males and females were repealed, but those against private and consensual homosexual conduct were retained. Contrary to the testimony of defendants Wade and Holt, there is no evidence (indeed, even no indication) that any of the interests advanced to support § 21.06—"morality, decency, health, welfare, safety, and procreation"— were considered by the legislature when this statute was passed as part of the general revision of the Penal Code.

The same interests were advanced by the state to justify the predecessor sodomy statute, Article 524, which condemned *all* sodomy—whether by married couples, single

males and females, or homosexuals.[28] If these interests (morality, decency, etc.) no longer justified the prohibition against heterosexual sodomy in 1974 when § 21.06 was enacted, how did they continue to justify the condemnation of private homosexual conduct? And, if they did, were they so weakened that they no longer warranted a punishment of imprisonment (2–15 years), but only a fine of $200 or less?

In fact, the legislature did not even condemn *all* homosexual conduct by § 21.06. That statute, as passed in 1974, prohibited only contact between the genitals of one person and the mouth or anus of another of the same sex. It did not prohibit homosexuals from kissing or sexually stimulating their partner with hands and fingers. Nor did § 21.06 condemn the use of an artificial device, such as a vibrator or dildo (until an amendment in 1981 which also prohibited "the penetration of the genitals or the anus of another person with an object"). Because of these—and other puzzling incon-

sistencies in the Penal Code [29]—it seems likely that political considerations motivated the legislature in passing § 21.06.[30]

*The Law*

The following discussion constitutes this Court's conclusions of law under Fed.R. Civ.P. 52(a).

*The Right of Privacy*

█ The "right of privacy" protects certain fundamental personal liberties from undue interference by government. *Carey v. Population Services,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Although Supreme Court opinions have found various constitutional provisions to be the source of this right of privacy [31]—the first amendment's

**28.** *See Dawson v. Vance,* 329 F.Supp. 1320 (S.D.Tex.1971). And, these same state interests (morality, decency, etc.) were the justification for the first Texas sodomy statute—even though it prohibited only anal sodomy and did not condemn oral sex by homosexuals or heterosexuals. *See Pruett v. State,* 463 S.W.2d 191 (Tex.Cr.App.—1971), appeal dismissed for want of substantial federal question, 402 U.S. 902, 91 S.Ct. 1379, 28 L.Ed.2d 643 (1971); *Prindle v. State,* 31 Tex.Cr.R. 551, 21 S.W. 360 (1893).

**29.** *See* Appendix A. Bestiality is prohibited only if it occurs in public; thus, under the Texas Penal Code, one may engage in private sexual acts with "an animal or fowl," § 21.07 (Public Lewdness)—but may not engage in private oral or anal sex with a consenting adult of the same sex, § 21.06 (Homosexual Conduct). And for seven years after 1974, a 17-year-old boy could have been prosecuted as a felon "for fondling a 16-year-old girl at her invitation in private, but not for engaging in sexual intercourse with her"—because it is a defense to statutory rape if the defendant is "not more than two years older than the victim," § 21.10, but there was no such defense to "indecency with a child," § 21.11, until this section was amended in 1981. Tex.Penal Code Ann. § 21.-11 (Practice Commentary).

**30.** As discussed in Appendix A, it has been suggested that members of the Texas House of Representatives "decided to support § 21.06,

as proposed, fearing a backlash against the entire Penal Code [revision] should [private homosexual conduct] be decriminalized." Similarly, in *New York v. Onofre,* 51 N.Y.2d 476, 434 N.Y.S.2d 947, 415 N.E.2d 936 (1980), *cert. denied,* 451 U.S. 987, 101 S.Ct. 2323, 68 L.Ed.2d 845 (1981), the court emphasized "the statement contained in the memorandum prepared by the chairman of the Temporary Commission: 'It would appear that the Legislature's decision to restore the consensual sodomy offense was, as with adultery, based largely upon the premises that *deletion thereof might ostensibly be construed as legislative approval of deviate conduct.*'" (434 N.Y.S.2d at 951–52, 415 N.E.2d at 941) (emphasis added).

**31.** "*See, e.g., Griswold v. Connecticut,* 381 U.S. at 484–85, 85 S.Ct. at 1681–82, 14 L.Ed.2d at 514–15 (Douglas, J.) (right of privacy found in 'penumbras' of specific guarantees of the Bill of Rights); *id.* at 486, 492, 85 S.Ct. at 1686, 14 L.Ed.2d at 516, 519 (Goldberg, J., joined by Warren, C.J., and Brennan, J.) (fundamental personal rights are protected by the concept of liberty in the Fourteenth Amendment's due process clause; Ninth Amendment shows framers' belief that fundamental rights exist that are not enumerated in the Bill of Rights); *id.* at 500, 85 S.Ct. at 1690, 14 L.Ed.2d at 524 (Harland, J., concurring) (Fourteenth Amendment's due process clause protects, of its own force, certain basic values); *Carey v. Population Services,* 431 U.S. at 684, 97 S.Ct. at 2015,

freedoms of association and of speech; the due process and equal protection clauses of the fourteenth amendment; the fourth and the ninth amendments; the "penumbras" of specific guarantees of the Bill of Rights— its existence is now "an established part of our constitutional jurisprudence." *Dike v. School Board,* 650 F.2d 783 (5th Cir.1981).

■ It is clear that the right of privacy protects individual decisions concerning marriage,[32] procreation,[33] contraception,[34] abortion,[35] and family relationships [36]—and that any government regulation upon such fundamental rights "may be justified only by a compelling state interest and must be narrowly drawn to express only the legitimate state interests at stake." *Dike v. School Board,* 650 F.2d at 786–87. However, the "outer limits" of the right of privacy have not been established. *Carey v. Population Services,* 431 U.S. at 684, 97 S.Ct. at 2015. Development of this area of the law has proceeded on almost a case-by-case basis,[37] and there are still other funda-

mental personal liberties—besides those involved in past Supreme Court decisions— that are protected by the right of privacy.[38]

Does the right of privacy extend to private sexual behavior between consenting adults? In particular: Can a husband and wife be subjected to criminal prosecution for engaging in oral or anal sex in the privacy of their own home? Can a state law constitutionally prohibit unmarried males and females from engaging in oral or anal sodomy or, indeed, *any* extramarital sexual relations? Can a homosexual be prosecuted for sexual conduct with another adult homosexual, consensually and in private?

The Supreme Court has not answered these questions in any opinion. Indeed, it has refused to do so on several occasions, including these three cases: *Buchanan v. Batchelor,* 308 F.Supp. 729 (N.D.Tex.1970), rev'd on other grounds sub nom, *Wade v. Buchanan,* 401 U.S. 989, 91 S.Ct. 1222, 28 L.Ed.2d 526 (1971); *Doe v. Commonwealth's*

52 L.Ed.2d at 684 (due process clause protects liberty interests in zones of personal privacy); *Roe v. Wade,* 410 U.S. at 153, 93 S.Ct. at 726, 35 L.Ed.2d at 177 (right of privacy founded in Fourteenth Amendment's concept of personal liberty and restrictions upon state action); ..." *Dike v. School Board,* 650 F.2d at 786, note 1.

**32.** *See Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967).

**33.** *See Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

**34.** *See Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Carey v. Population Services,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977).

**35.** *See Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Bellotti v. Baird,* 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979).

**36.** *See Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977).

**37.** In *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), the right of

privacy was officially recognized, but the opinion (by Justice Douglas) was unclear whether the prohibition on state regulation of a married couple's access to the use of contraceptives was limited to the marital relationship, or whether it was the intimacy and choice of individuals, themselves, that was protected. Then, *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), and *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), which guaranteed birth control devices and abortions for unmarried persons, held that the privacy protected is "the right of the individual, married or single." And, *Planned Parenthood v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), and *Carey v. Population Services,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), continued the principle that individual decisions were protected, and that the right of privacy was not limited to the marital relationship. The cases cannot be limited to their particular fact situations since "the outer limits of this aspect of privacy have not been marked by the Court" (431 U.S. at 684, 97 S.Ct. at 2015).

**38.** *See, e.g., Stanley v. Georgia,* 394 U.S. at 564, 89 S.Ct. at 1247 (possession of pornographic printed or filmed matter in the privacy of one's own home); *Dike v. School Board,* 650 F.2d at 787 (right of school teacher to breastfeed her child during duty free lunch periods).

*Attorney,* 403 F.Supp. 1199 (E.D.Va.1975), summary affirmance without opinion, 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976); and *New York v. Onofre,* 51 N.Y.2d 476, 434 N.Y.S.2d 947, 415 N.E.2d 936 (N.Y. 1980), cert. denied, 451 U.S. 987, 101 S.Ct. 2323, 68 L.Ed.2d 845 (1981).[39]

### Buchanan v. Batchelor

In *Buchanan v. Batchelor,* 308 F.Supp. 729 (N.D.Tex.1970), a three-judge panel (Goldberg, Circuit Judge; Hughes and Taylor, District Judges) held that the Texas sodomy statute (Article 524)—which then prohibited *all* oral and anal sex, whether by heterosexuals or homosexuals—was unconstitutional because it violated the right of privacy of married couples by subjecting them to felony prosecution for private acts of sodomy, "an intimate relation of husband and wife." The court stated:

> "Sodomy is not an act which has the approval of the majority of the people. In fact such conduct is probably offensive to the vast majority, but such opinion is not sufficient reason for the State to encroach upon the liberty of married persons in their private conduct. Absent some demonstrable necessity, matters of (good or bad) taste are to be protected from regulation...." (308 F.Supp. at 733).

The court permanently enjoined the defendant Wade from enforcing Article 524, which "was declared void on its face for unconstitutional overbreadth." However, this decision was prior to *Eisenstadt,* and the court indicated that the right of privacy did not extend to private or public homosexual conduct because neither involved "private acts of the marital relation" (308 F.Supp. at 736).

On appeal, the Supreme Court did not reach the merits, 401 U.S. 989, 91 S.Ct. 1222, 28 L.Ed.2d 526 (1971), but remanded the case for consideration as to whether abstention was proper in light of its then-recent decision in *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).[40] However, the three judge panel had specifically noted that "there have been no prosecutions under the Act of married persons for private acts of sodomy"; that it was unclear from the record "whether there have been prosecutions of homosexuals for private acts of sodomy"; that no changes were pending against the intervenors, a married couple (the Gibsons) and a homosexual male (Strickland); but that the homosexual plaintiff, Buchanan, "had twice been arrested and charged" with acts of sodomy with another male in public restrooms (308 F.Supp. at 730–31).

Therefore, even if a *Younger* abstention problem was presented in *Buchanan* by the homosexual plaintiff, who sought an injunction against two pending state prosecutions for public offenses—none was presented by either of the intervenors, the married couple (who had prevailed in their right of privacy claim) and the homosexual Strickland (who had not prevailed in his).

### Doe v. Commonwealth's Attorney

Next, in *Doe v. Commonwealth's Attorney,* 403 F.Supp. 1199 (E.D.Va.1975), a three-judge panel upheld the constitutionality of a Virginia criminal statute which prohibited oral or anal sodomy by married couples, by unmarried males and females, and by homosexuals. The majority opinion rejected the contention that the right of

**39.** Other instances include *Lovisi v. Slayton,* 539 F.2d 349 (4th Cir.1975) (en banc), *cert. denied,* 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 585 (1976); *Canfield v. Oklahoma,* 506 P.2d 987 (Okla.Cr.App.1973), dism'd for want of substantial federal question, 414 U.S. 991, 94 S.Ct. 342, 38 L.Ed.2d 230 (1973); *Pruett v. Texas,* 463 S.W.2d 191 (1971), dism'd for want of substantial federal question, 402 U.S. 902, 91 S.Ct. 1379, 28 L.Ed.2d 643 (1971).

**40.** Federal courts must not enjoin pending state criminal prosecutions except under extraordinary circumstances—such as a "great and immediate" threat to the plaintiff's constitutional rights that cannot be eliminated by his defense against a single prosecution (401 U.S. at 45–47, 91 S.Ct. at 751–752), or bad faith and harassment through repeated prosecutions or threats of prosecution (401 U.S. at 47–50, 91 S.Ct. at 752–753). *Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

privacy extends to private homosexual conduct between consenting adults. However, Judge Merhige's dissenting opinion concluded that, under a proper analysis of the Supreme Court decisions, the right of privacy does protect *all* private consensual sexual conduct between adults, whether heterosexual or homosexual:

"... I view those cases [*Roe v. Wade, Griswold v. Connecticut*] as standing for the principle that every individual has a right to be free from unwarranted governmental intrusion into one's decisions on private matters of intimate concern. A mature individual's choice of an adult sexual partner, in the privacy of his or her own home, would appear to me to be a decision of the utmost private and intimate concern. Private consensual sex acts between adults are matters, absent evidence that they are harmful, in which the state has no legitimate interest.

"...

"*Griswold, supra,* in its context, applied the right of privacy in sexual matters to the marital relationship. *Eisenstadt, supra,* however, clearly demonstrates that the right to privacy in sexual relationships is not limited to the marital relationship. Both *Roe, supra,* and *Eisenstadt, supra,* cogently demonstrate that intimate personal decisions or private matters of substantial importance to the well-being of the individuals involved are protected by the Due Process Clause. The right to select consenting adult sexual partners must be considered within this category. The exercise of that right, whether heterosexual or homosexual, should not be proscribed by state regulation absent compelling justification." (403 F.Supp. at 1203–04) (Merhige, dissenting).

The Supreme Court, without writing an opinion, summarily affirmed the majority decision in *Commonwealth's Attorney,* 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976).[41]

However, this summary affirmance *does not* resolve the issues presented in this case. A summary affirmance is "not of the same precedential value as would be an opinion of the [Supreme] Court treating the same question on the merits." *Edelman v. Jordan,* 415 U.S. 651, 671, 94 S.Ct. 1347, 1359, 39 L.Ed.2d 662 (1974); *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975).[42] A summary affirmance does not prevent "lower courts from coming to opposite conclusions except on "the precise issues presented and necessarily determined by those actions." *Illinois State Board v. Socialist Workers Party,* 440 U.S. 173, 99 S.Ct. 983, 59 L.Ed.2d 230 (1979); *Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977). Nor does it bind a lower court when "doctrinal developments" cast substantial doubt upon the summary affirmance. As summarized in *Lecates v. Justice of the Peace,* 637 F.2d 898 (3rd Cir.1980):

"... In short, under *Mandel* and *Illinois State Board,* the precedential value of a summary disposition by the Supreme Court is to be confined to the exact facts of the case and to the precise question posed on the jurisdictional statement. Furthermore, indications that there have been doctrinal developments since the summary action will relieve a lower court from the duty to adhere to a summary disposition" (637 F.2d at 904).

Both factors are present here. The jurisdictional statement in *Commonwealth's Attorney* did present the same "right of priva-

---

**41.** Justices Brennan, Marshall, and Stevens would have noted probable jurisdiction and set the case for oral argument. 425 U.S. at 901, 96 S.Ct. at 1489.

**42.** As explained in *Fusari v. Steinberg,* 419 U.S. 379, 95 S.Ct. 533, 42 L.Ed.2d 521 (1975):

"When we summarily affirm without an opinion ... we affirm the judgment but not necessarily the reasoning by which it was reached. An unexplicated summary affirmance settles the issues *for the parties,* and is not to be read as a renunciation by this Court of doctrine previously announced in our opin-

cy" issue as this case,[43] but—since the Virginia statute proscribed all sodomy, both heterosexual and homosexual—it did not present the "equal protection" claim involved in this case (that § 21.06 invidiously discriminates against homosexuals by prohibiting sodomy by them, but not by heterosexuals).[44] Moreover, even as to the right of privacy issue, two "doctrinal developments" have indicated that little, if any, weight should be given to the summary affirmance in *Commonwealth's Attorney:* (i) the decision in *Carey v. Population Services,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977); and (ii) the denial of certiorari in *New York v. Onofre,* 51 N.Y.2d 476, 434 N.Y.S.2d 947, 415 N.E.2d 936 (1980), cert. denied, 451 U.S. 987, 101 S.Ct. 2323, 68 L.Ed.2d 845 (1981).

In *Carey v. Population Services,* decided less than 15 months after the summary affirmance in *Commonwealth's Attorney,* the Supreme Court stated that:

> "... the Court has not definitively answered the difficult question whether and to what extent the Constitution prohibits state statutes regulating [private consensual sexual] behavior among adults, ... and we do not purport to answer that

question now" (431 U.S. 688 at n. 5, 97 S.Ct. 2018 at n. 5; 431 U.S. 694, n. 17, 97 S.Ct. 2021, n. 17).

*Carey* was a plurality decision. However, Justice Brennan made this comment twice in the opinion—first in footnote 5 of Part III (431 U.S. at 688, 97 S.Ct. at 2018), which was joined by six Justices (Brennan, Stewart, Marshall, Blackmun, Stevens and White); second in footnote 17 of Part IV (431 U.S. at 694, 97 S.Ct. at 2021), which was joined by four Justices (Brennan, Stewart, Marshall, and Blackmun).[45] Thus, six Justices in *Carey* agreed that the summary affirmance in *Commonwealth's Attorney* did not definitively answer the difficult question of whether the right of privacy extends to private sexual conduct between consenting adults.[46]

### New York v. Onofre

Finally, the Supreme Court denied certiorari in a case which—contrary to *Commonwealth's Attorney*—held that the right of privacy did extend to private sexual conduct between adults: *New York v. Onofre,* 434 N.Y.S.2d 947, 415 N.E.2d 936 (N.Y. 1980), cert. denied, 451 U.S. 987, 101 S.Ct. 2323, 68 L.Ed.2d 845 (1981).

---

ions after full argument" (419 U.S. at 391–92, 95 S.Ct. at 540–41).

**43.** The question presented in the *Commonwealth's Attorney* Jurisdictional Statement was this:

"Whether Virginia Code § 18.1–212, as applied to sexual activity between consenting adults in private, violates appellants' constitutional rights to privacy, to due process of law, and to the equal protection of the laws, under the First, Fourth, Fifth, Ninth and Fourteenth Amendments to the Constitution."

**44.** Under the Virginia sodomy statute, homosexuals were not treated differently than married or unmarried heterosexuals. Although the question presented in *Commonwealth's Attorney* refers to "equal protection," the Jurisdictional Statement makes it clear that this merely referred to one of the several constitutional sources of the "right of privacy" (see note 31), and that no separate equal protection claim was involved.

**45.** Justice White's concurring opinion stated that he did not regard Part III of the majority opinion "as declaring unconstitutional any

state law forbidding sexual relations" (431 U.S. at 702, 97 S.Ct. at 2025).

**46.** This conclusion is supported by the dissent of Justice Rehnquist in *Carey.* He disagreed, and could not "let pass without comment," the statements in footnotes 5 and 17:

"While we have not ruled on every conceivable regulation affecting such conduct the facial constitutional validity of criminal statutes prohibiting certain consensual acts has been 'definitively' established. *Doe v. Commonwealth's Attorney,* 425 U.S. 901 [96 S.Ct. 1489, 47 L.Ed.2d 751] (1976). *See Hicks v. Miranda,* 422 U.S. 332, 343–344 [95 S.Ct. 2281, 2288–2289, 45 L.Ed.2d 223] (1975)." (431 U.S. 718 at n. 2, 97 S.Ct. 2033 at n. 2)

No one joined the Rehnquist dissent—and, despite his comments, six Justices agreed that the Court "has not definitively answered the difficult question whether and to what extent the Constitution prohibits state statutes regulating such [private consensual sexual] behavior among adults" (431 U.S. 688 at n. 5, 97 S.Ct. 2018 at n. 5).

The New York sodomy statute prohibited oral and anal sex between homosexuals and between unmarried males and females; it did not condemn sodomy between persons who were married to each other. After reviewing the Supreme Court decisions, the New York Court of Appeals held that the right of privacy does extend to private sexual conduct between consenting adults and that the statute violated this right of the defendants [47] (as well as their rights of equal protection):

"... Because the statutes are broad enough to reach noncommercial, cloistered personal sexual conduct of consenting adults and because it permits the same conduct between persons married to each other without sanction, we agree with defendants' contentions that it violates both their right of privacy and the right to equal protection of the laws guaranteed them by the United States Constitution.

"...

"In light of these decisions,[48] protecting under the cloak of the right of privacy individual decisions as to indulgence in acts of sexual intimacy by unmarried persons and as to satisfaction of sexual desires by resort to material condemned as obscene by community standards when done in a cloistered setting, no rational basis appears for excluding from the same protection decisions—such as those made by defendants before us—to seek sexual gratification from what at least once was commonly regarded as 'deviant' conduct, so long as the decisions are voluntarily made by adults in a noncommercial, private setting." (434 N.Y.S.2d at 949, 951, 415 N.E.2d at 938, 940).

The Supreme Court's denial of certiorari in *Onofre,* 451 U.S. 987, 101 S.Ct. 2323, 68 L.Ed.2d 845 is of no precedential value; it does not constitute a decision on the merits of the constitutional questions. *Rosenberg v. United States,* 344 U.S. 889, 73 S.Ct. 134, 97 L.Ed. 687 (1952); *Brown v. Allen,* 344 U.S. 443, 492, 73 S.Ct. 397, 439, 97 L.Ed. 469 (1953).

However, the lower court decisions in *Onofre* and *Commonwealth's Attorney* are inconsistent: *the constitutional right of privacy extends to private sexual conduct between consenting adults in New York, but it does not in Virginia.*[49] And, there is no Supreme Court opinion that determines which approach is constitutionally correct— and which answers "the difficult question whether and to what extent the Constitution prohibits state statutes regulating [private consensual sexual] behavior among adults." *Carey v. Population Services,* 431 U.S. at 688 n. 5, 97 S.Ct. at 2018 n. 5.

Therefore, despite the summary affirmance in *Commonwealth's Attorney,* the question of whether the Constitution permits the use of a state statute (such as § 21.06) to prohibit private consensual homosexual conduct is a proper one for consideration by this Court.[50]

**47.** In *Onofre,* three cases were consolidated for decision. One involved anal sodomy between two consenting homosexual males at the defendant's home (*Onofre*); one involved oral sodomy between two males in an automobile (*People v. Goss*); and one involved oral sodomy between a female (*Sweat*) and a male in an automobile. Neither of the two incidents occurring in cars took place "in public." (434 N.Y.S.2d at 948, 949 n. 2, 415 N.E.2d at 937, 938 n. 2).

**48.** *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349; *Carey v. Population Services,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675; *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542.

**49.** Possibly the Supreme Court's actions can be resolved by the fact that *Onofre* involved an equal protection claim, while *Commonwealth's Attorney* did not (see note 44). If so, this would confirm this Court's decision that § 21.-06 violates the plaintiff's right to equal protection because it discriminates against homosexuals by prohibiting sodomy by them, but not by heterosexuals.

**50.** The same conclusion was reached in *New York v. Onofre,* 434 N.Y.S.2d at 954, 415 N.E.2d at 943. However, Judge Porter reached a different conclusion in *Childers v. Dallas Police Dept.,* 513 F.Supp. 134 (N.D.Tex.1981), *aff'd without opinion,* 669 F.2d 732 (5th Cir. 1982). See the discussion of *Childers* in Appendix A.

*private homosexual conduct is protected*

This Court agrees with the analysis of the right of privacy by the dissenting opinion of Judge Merhige in *Doe v. Commonwealth's Attorney,* 403 F.Supp. 1199, and by the majority opinion in *New York v. Onofre,* 51 N.Y.2d 476, 434 N.Y.S.2d 947, 415 N.E.2d 936.

■ Every individual has the right to be free from undue interference by the state in important and intimate personal matters. Decisions concerning a person's sexual needs or desires are "in a field that by definition concerns the most intimate of human activities and relationships." *Carey,* 431 U.S. at 685, 97 S.Ct. at 2016. The right of two individuals to choose what type of sexual conduct they will enjoy in private is just as personal, just as important, just as sensitive—indeed, even more so—than the decision by the same couple to engage in sex using a contraceptive to prevent unwanted pregnancy. *Carey,* 431 U.S. at 685, 687, 97 S.Ct. at 2016, 2017. "If the right of privacy means anything, it is the right of the *individual,* married or single, to be free of unwarranted government intrusion into matters fundamentally affecting a person" as the decision to engage in private sexual conduct with another consenting adult. *Eisenstadt,* 405 U.S. at 453, 92 S.Ct. at 1038.

■ This is true whether it is a husband and wife choosing to engage in oral or anal sex in the privacy of their bedroom—or whether it is an unmarried male and female privately engaging in extramarital sexual relations of their own choice.[51] And, it is equally true as to a homosexual choosing to engage in sodomy in private with a consenting adult of the same sex.[52] The right of privacy, therefore, does extend to private sexual conduct between consenting adults (whether heterosexual or homosexual)—and

any regulation of this fundamental right must be justified by a compelling state interest.

■ The right of privacy is not, as defendants contend, "limited to only two aspects of sexual behavior"—marital intimacy (by virtue of *Griswold v. Connecticut*) and procreative choice (by reason of *Eisenstadt v. Baird*). Indeed, *Eisenstadt* makes it clear that the right of privacy in sexual matters is not limited to married couples:

"If under *Griswold* the distribution of contraceptives to married persons cannot be prohibited, a ban on distribution to unmarried persons would be equally impermissible. It is true that in *Griswold* the right of privacy in question inhered in the marital relationship. Yet the marriage couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional make-up. If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child. *See Stanley v. Georgia,* 394 U.S. 557 [89 S.Ct. 1243, 22 L.Ed.2d 542] (1969)...." (405 U.S. at 453, 92 S.Ct. at 1038).

Moreover, in *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), the right of privacy involved neither "marital intimacy" or "procreative choice." There, the defendant possessed films and printed material which were pornographic. As discussed in *New York v. Onofre:*

"... In *Stanley* the court found violative of the individual's right to be free from governmental interference in making important, protected decisions a stat-

---

51. Although these issues are not directly presented in this case, it seems obvious that the right of privacy would not extend to private homosexual conduct if it did not extend to private heterosexual conduct.

52. From the testimony of the plaintiff, Donald F. Baker, about his life—the reluctant, painful recognition of his homosexuality; his disgust

and self-loathing and fear; his isolation and suffering; and the eventual reconciliation of his "exclusive homosexuality" with his devout religious beliefs and family values—it is evident that Baker's resulting decisions concerning his sexual needs and desires are of the most personal, intimate and important concern (just as they are for heterosexuals).

ute which made criminal the possession of obscene matter within the privacy of the defendant's home. Although the material itself was entitled to no protection against government proscription (*Roth v. United States,* 354 U.S. 476 [77 S.Ct. 1304, 1 L.Ed.2d 1498]), the defendant's choice to seek sexual gratification by viewing it and the effectuation of that choice within the bastion of his home, removed from the public eye, was held to be blanketed by the constitutional right of privacy." (434 N.Y.S.2d at 950, 415 N.E.2d at 939).

See *Doe v. Commonwealth's Attorney,* 403 F.Supp. at 1204–05 (Merhige, J., dissenting).

Under the *Stanley* and *Eisenstadt* extensions of the right of privacy,[53] the plaintiff could possess and enjoy *in private* pornographic material—movies, videotapes, magazines, books, etc.—which graphically depicts sexual activities by homosexuals. It seems ludicrous to attempt to draw some constitutional distinction, as defendants do, between his right to "seek sexual gratification by viewing" such obscene material, and

his right to seek sexual gratification with a consenting adult partner in private.

The right of privacy does extend to private, voluntary, intimate relationships—between husband and wife, between unmarried males and females, between homosexuals.[54] Accordingly, homosexual conduct in private between consenting adults is protected by a fundamental right of privacy. Any state restriction upon that right must be justified by some compelling state interest.

### no state interest

■ The right of privacy is not absolute. But any regulation of this fundamental right "may be justified only by a compelling state interest and must be narrowly drawn to express only the legitimate state interests at stake." *Dike v. School Board,* 650 F.2d at 787.

■ Obviously, the state has a compelling interest in regulating some types of sexual conduct—rape, indecent acts in public, sex offenses involving minors, etc. *New*

**53.** Contrary to defendants' arguments, *Stanley v. Georgia* was *not* based solely upon a first amendment right to receive information. As the Court stated:

"... Moreover, in the context of this case—a prosecution for mere possession of printed or filmed matter in the privacy of a person's own home—that right takes on an added dimension. *For also fundamental is the right to be free, except in very limited circumstances, from unwanted government intrusions into one's privacy."* (394 U.S. at 564, 89 S.Ct. at 1247).

However, there is no right of privacy "to watch obscene movies in places of public accommodation." *Paris Adult Theater I v. Slaton,* 413 U.S. 49, 67, 93 S.Ct. 2628, 2640, 37 L.Ed.2d 446 (1973).

**54.** Other courts have reached the same conclusion, extending the right of privacy to private sexual conduct between consenting adults. *See State v. Saunders,* 75 N.J. 200, 381 A.2d 333 (1977); *State v. Pilcher,* 242 N.W.2d 348 (Iowa 1976). Cf. *Nemetz v. Immigration & Naturalization Service,* 647 F.2d 432 (4th Cir. 1981); *Lesbian Gay Freedom Day Committee, Inc. v. Immigration & Naturalization Service,* 541 F.Supp. 569 (N.D.Cal.1982); *Gay Law Students Ass'n v. Pacific Tel. & Tel. Co.,* 24 Cal.3d 458, 156 Cal.Rptr. 14, 595 P.2d 592 (1979); *Commonwealth v. Bonadio,* 490 Pa. 91, 415 A.2d 47 (1980) (sodomy statute declared consti-

tutionally infirm on equal protection grounds, privacy issue not reached). *See also Doe v. Commonwealth's Attorney,* 403 F.Supp. 1205 n. 3 (Merhige, J., dissenting).

But some other courts have refused to do so, although some of these involve the use of force or offenses with minors. *See Lovisi v. Slayton,* 539 F.2d 349 (4th Cir.1975) (en banc), cert. denied, 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 585 (1976); *Wilson v. Swing,* 463 F.Supp. 555 (M.D.N.C.1978); *State v. Santos,* 413 A.2d 58 (R.I.1980); *Neville v. State,* 290 Md. 364, 430 A.2d 570 (1981); *State v. Elliott,* 89 N.M. 305, 551 P.2d 1352 (1976), *later appeal, State v. Elliott,* 89 N.M. 756, 557 P.2d 1105 (1977) (enforcing earlier opinion); *State v. McCoy,* 337 So.2d 192 (La.1976).

And, at least one court has recognized "that there is substantial academic comment which argues that the choice to engage in homosexual action is a personal decision entitled, at least in some instances, to full protection as an aspect of the individual's right of privacy." *Beller v. Middendorf,* 632 F.2d 788, 809 (9th Cir.1980). *See* L. Tribe, American Constitutional Law § 15–13 (1978 and Supp.1979); Gerety, *Redefining Privacy,* 12 Harv.C.R.–C.L.Rev. 233, 280–81 (1977); Wilkinson & White, *Constitutional Protection for Personal Lifestyle,* 62 Cornell L.Rev. 563 (1977).

*York v. Onofre,* 434 N.Y.S.2d at 952, 415 N.E.2d at 941; *Doe v. Commonwealth's Attorney,* 403 F.Supp. at 1204 (Merhige, J., dissenting). But does the state have any interest in regulating private sexual conduct between consenting adults—or in criminally prosecuting homosexuals for private, consensual sodomy?

Basically, the defendants claim that the state's interests justifying the ban on homosexual conduct by § 21.06 are (i) morality and decency, (ii) public health, (iii) welfare and safety, and (iv) procreation.[55] However, the evidence presented at trial *did not* support any of these claims. Instead, it established that the state has no "compelling interest" to justify § 21.06—and that, indeed, this statute is not even "rationally related" to any "legitimate state interest." *Silva v. Vowell,* 621 F.2d 640, 647 (5th Cir. 1980).

The defendants did not produce a single witness, or any other evidence, to support the alleged state interests of "morality and decency, welfare and safety, and procreation." They did present one witness who testified about the state's supposed interest in "public health" furthered by § 21.06. This was Dr. James Grigson—who was not an expert in the field of homosexuality—but who testified that criminal sanctions against homosexual conduct would promote the health of (i) children, by fostering their growth and development, and (ii) homosexuals, by forcing them to seek psychiatric

treatment and be "cured." These opinions are not based upon any independent research; they are contrary to the medical and psychiatric literature, to the opinions of most American psychiatrists today, and to the very credible evidence given by plaintiff's experts. For these, and the other reasons discussed above, this Court completely discounts Dr. Grigson's testimony and opinions.

■ In addition to the lack of any expert testimony supporting the claimed state interests, both District Attorney Wade and City Attorney Holt were unable to explain how § 21.06 furthered the supposed interests of morality or decency, the welfare of society, procreation, or any other interest. Nor was there any evidence that the Texas legislature had even considered these alleged interests when it passed § 21.06 as part of the general revision of the Penal Code in 1974. Therefore, *under the record in this case, the defendants have nothing to rely upon but the assertion of general platitudes* (morality, decency, etc.). This is totally inadequate to justify § 21.06, as shown by *Commonwealth's Attorney:*

"The defendants, represented by the highest legal officer of the state, made no tender of any evidence which even impliedly demonstrated that homosexuality causes society any significant harm. No effort was made by the defendants to establish either a rational basis or a com-

---

**55.** Somewhat different justifications were offered at various times by each defendant:

*Dallas County* (through District Attorney Wade) claimed the "traditional police powers to provide for the security, welfare, safety, morals, decency *and other interests*" (motion for summary judgment, p. 30) ... the "safety, health, decency, morals, general welfare *and to promote order in society*" (motion for summary judgment, p. 26) ... the "decency, welfare of society, procreation, morals, and *other self-evident state interests*" (Amd. Response to Request for Admissions, ¶ 4) ... the protection of "those within [the state's] borders by proscribing homosexual conduct" (post-trial brief, p. 21) ... the reinforcement "of normal growth and behavioral patterns" and the inducement to "those homosexuals who now seek help to overcome their tendencies" (post-trial brief, p. 21).

The *City of Dallas* (through City Attorney Holt) claimed "the preservation of morality, the maintaining of a decent society, the promotion of mental health" (proposed findings 6–8) ... the "continued procreation of society and protection of morals" (Amd. Response to Request for Admissions, ¶ 4) ... "upholding morality and decency" (post-trial brief, p. 5) ... the "health, welfare and morals of individuals and of society" (pretrial order, p. 3) ... the "positive effect upon the ability of children to form a 'positive gender identification' and to reinforce societal norms of acceptable sexual behavior" (post-trial brief, pp. 5–8).

The *State of Texas* (through its Attorney General) claimed only procreation: "Should homosexual conduct become too widespread, society would lose its means of reproducing itself" (Response of The State of Texas, p. 3).

pelling state interest so as to justify the proscription of § 8.1–212 of the Code of Virginia, presently under attack.

"...

"On the basis of this record one can only conclude that the sole basis of the proscription of homosexuality was what the majority refers to as the promotion of morality and decency. As salutary a legislative goal as this may be, I can find no authority for intrusion by the state into the private dwelling of a citizen. *Stanley v. Georgia,* 394 U.S. 557 [89 S.Ct. 1243, 22 L.Ed.2d 542] ... The Supreme Court has made it clear that fundamental rights of such an intimate facet of an individual's life as sex, absent circumstances warranting intrusion by the state, are to be respected. My brothers, I respectfully suggest, have by today's ruling misinterpreted the issue—the issue centers not around morality or decency, but the constitutional right of privacy." (403 F.Supp. at 1205) (Merhige, J., dissenting).

Moreover, the plaintiff's evidence establishes that there is no compelling state interest served by § 21.06—and that, indeed, this statute's condemnation of homosexual conduct is not even rationally related to a legitimate state interest. In particular, this evidence (including the testimony of the experts, Dr. Marmor and Dr. Simon) established the following:

Homosexuals are not ill or mentally diseased. They are not criminals. They have no propensity for crimes, those involving sexual offenses or otherwise, any more than heterosexuals. But over 700,-000 individuals are "criminals" in Texas today because of § 21.06.

Homosexuality is not a matter of choice. It is fixed at a very early age. Only a small percentage of homosexuals can be changed or "cured" by psychiatric treatment. The numbers of homosexuals in society are not reduced by criminal laws like § 21.06, nor would they be increased if such laws did not exist.

Homosexuality is not communicable. The absence of § 21.06 would not lead to increased crime or violence or other threats to public health or safety. This statute does not further the "growth and development" of children and it harms, rather than helps, the mental health of homosexuals. There is simply no rational connection between the acts proscribed by § 21.06 and the claimed interests of morality, decency, health, welfare, safety and procreation.

■ Therefore, § 21.06 is not justified by any "compelling state interest." Moreover, its prohibition against private homosexual conduct between consenting adults is not even rationally related to any legitimate state interest. Accordingly, § 21.06 is unconstitutional because it violates the plaintiff's fundamental right of privacy.[56]

*Equal Protection*

■ Section 21.06 does not prohibit sodomy between consenting adults of the opposite sex; only oral or anal sex between consenting adults of the same sex is illegal. Thus, *on its face,* § 21.06 discriminates against homosexuals by making acts criminal when committed by them, but not by heterosexuals. This violates the plaintiff's right to equal protection of the law unless the discrimination between heterosexuals and homosexuals bears "some rational relationship to legitimate state purposes." *San Antonio School District v. Rodriquez,* 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973); *Silva v. Vowell,* 621 F.2d 640, 647 (5th Cir.1980).

■ As discussed in the preceding section, the evidence in this case established that none of the interests claimed by defendants (morality and decency, public health, welfare and safety, and procreation) were furthered by § 21.06—and that this

56. The defendant Wade's argument that the plaintiff "waived" or "abandoned" his right of privacy is absurd. The fact that the plaintiff was the subject of an interview in a magazine article (Texas Monthly, p. 180; defendant Wade's exh. 1) is certainly not a consent to "unwarranted governmental intrusion" into his personal and intimate decisions concerning private sexual conduct.

statute is not "rationally related" to any "legitimate state interest." Indeed, the defendant Wade conceded this; he testified that he knew of no rational basis for the discrimination in § 21.06 between homosexual sodomy and heterosexual sodomy:

"Q. Doesn't the statute, § 21.06, doesn't it permit private sodomy by heterosexuals but not homosexuals?

"A. I wouldn't even know that, but I'm taking your word for it.

"Q. Assume it does.

"A. Yeah.

"Q. What rational basis is there for that classification, if you know of any?

"A. I don't know of any."

Therefore, § 21.06 is invalid because it violates the plaintiff's right to equal protection. *New York v. Onofre*, 51 N.Y.2d 476, 434 N.Y.S.2d 947, 415 N.E.2d 936, held that a statute which prohibited sodomy between unmarried persons (whether heterosexual or homosexual), but not between married couples, was unconstitutional:

"*As to The Denial of defendants' right to equal protection.* Section 130.38 of the Penal Law on its face discriminates between married and unmarried persons, making criminal when done by the latter what is innocent when done by the former. With that distinction drawn, we look to see whether there is, as a minimum, 'some ground of difference that rationally explains the different treatment accorded married and unmarried persons' under the statute ... In our view, none has been demonstrated or identified by the People ... The statute therefore must fall as violative of the

right to equal protection enjoyed by persons not married to each other." (434 N.Y.S.2d at 953, 415 N.E.2d at 942).[57]

Accord: *Commonwealth v. Bonadio*, 490 Pa. 91, 415 A.2d 47 (1980).

### plaintiff's claims

The plaintiff claims that the "rational relationship" test is too lenient, and that the state must show a "compelling state interest" in order to justify the discrimination in § 21.06. Two arguments are advanced:

(i) that § 21.06 discriminates on the basis of sex "in that a male may commit sodomy with a female, but not with a male, and a female may indulge in sodomy with a male, but not with a female";

(ii) that homosexuals constitute members of a "suspect class"—and, like the previously recognized suspect classes of race, religion, national origin, and alienage—are entitled to the "compelling state interest" standard of review under *Frontiero v. Richardson*, 411 U.S. 677 [93 S.Ct. 1764, 36 L.Ed.2d 583] (1973).

Alternatively, the plaintiff contends that this Court should apply "the emerging intermediate level of review" which has been approved by the Supreme Court in equal protection cases involving discrimination on the basis of gender and illegitimacy." Here, the plaintiff relies upon such cases as *Mills v. Habluetzel*, 456 U.S. 91, 102 S.Ct. 1549, 71 L.Ed.2d 770 (1982) and *Plyler v. Doe*, —— U.S. ——, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).

It is not necessary to reach these contentions.[58] This opinion has concluded that the

**57.** As discussed above (notes 44, 49), no equal protection claim was involved in *Doe v. Commonwealth's Attorney*, 403 F.Supp. 1199, because the Virginia statute condemned *all* acts of sodomy, both homosexual and heterosexual. Therefore, even if this Court is erroneous in its conclusion that the Supreme Court's summary affirmance in *Commonwealth's Attorney* does not preclude a determination that the right of privacy extends to private homosexual conduct, it certainly does not affect the decision that § 21.06 violates the equal protection rights of the plaintiff and other homosexuals.

**58.** If the issue were reached, this Court would hold that homosexuals are not a "suspect class" for equal protection purposes—since the Supreme Court has not even concluded yet that *sex* is a suspect class, *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583. *See Holloway v. Arthur Andersen & Co.*, 566 F.2d 659 (9th Cir.1977) (transsexuals are not a suspect class). *Cf. DeSantis v. Pacific Tel. & Tel Co.*, 608 F.2d 327 (9th Cir.1979) (homosexuals not "class" within Title VII protection); *Kirkpatrick v. Seligman & Latz, Inc.*, 636 F.2d 1047, 1050 (5th Cir.1981).

plaintiff's right of privacy is violated because no "compelling state interest" justifies § 21.06—and that there is a denial of equal protection because § 21.06 "bears no rational relationship to any legitimate state interest." Obviously, under either of the two equal protection standards urged by the plaintiff ("compelling state interest" or "intermediate level of review"), this Court would conclude that there is a denial of equal protection by § 21.06.

### public distaste

The defendants claim that "it is undisputed that homosexual sodomy, far from being a proud and cherished tradition, is a practice which has been abhorred in western civilization and has long inspired an almost universal phobic response." Similar statements are found in some of the cases involving Texas sodomy statutes. See Appendix A; *Dawson v. Vance,* 329 F.Supp. 1320 (S.D.Tex.1971).

█ These are overstatements. In several countries today, homosexuality is not criminal; and it has been decriminalized, without adverse effects, in some 21 states in this country.[59] But even if there is widespread public distaste, this would not be any "legitimate state interest" to rationalize a denial of equal protection—nor would it be a "compelling state interest" to justify a denial of the right of privacy. See *United States v. Moreno,* 413 U.S. 528, 534–35, 93 S.Ct. 2821, 2825–26, 37 L.Ed.2d 782 (1973). As discussed in *New York v. Onofre:*

"... it has been deemed irrelevant by the United States Supreme Court that the purchase and use of contraceptives by unmarried persons would arouse moral indignation among broad segments of our community or that the viewing of pornographic materials even within the privacy of one's home would not evoke general approbation *(Eisenstadt v. Baird, Stanley v. Georgia).* We are not unmindful of

the sensibilities of many persons who are deeply persuaded that consensual sodomy is evil and should be prohibited. That is not the issue before us.... The community and its members are entirely free to employ theological teaching, moral suasion, parental advice, psychological and psychiatric counseling and other noncoercive means to condemn the practice of consensual sodomy. The narrow question before us is whether the Federal Constitution permits the use of the criminal law for that purpose." (434 N.Y.S.2d at 951 n. 3, 415 N.E.2d at 940 n. 3).

Indeed, the Supreme Court has emphasized that cases involving controversial sexual issues must be resolved "by constitutional measurement, free of emotion and free of predilection" because the Constitution is made for people of fundamental differing views, and "the accident" of our finding certain opinions "novel and even shocking ought not to conclude our judgment upon the question" of constitutionality. *Roe v. Wade,* 410 U.S. at 116–17, 93 S.Ct. at 708–09, quoting the "now-vindicated dissent" of Justice Holmes in *Lochner v. New York,* 198 U.S. 45, 76, 25 S.Ct. 539, 547, 49 L.Ed. 937 (1905).

### Additional Matters

Several other matters raised by the parties must be addressed to show their consideration—and rejection—by this Court.

### establishment of religion

█ The plaintiff's claim that § 21.06 violated the establishment clause of the first amendment was a second-line attack upon this statute. The evidence did not establish any such constitutional violation.

To the contrary, the testimony of the plaintiff's expert in religion (Dr. Furnish) was that private consensual homosexual conduct was not condemned by the bible, although he conceded other scholars disagreed with his opinions (see note 12). The

---

**59.** Dr. Judd Marmor, the plaintiff's expert, also testified that "Ford and Beach did a study of 76 societies and found in almost two-thirds of them, homophobia [an exaggerated fear of homosexuals among heterosexuals] did not exist,

and some form of homosexuality was permitted. One-third of the societies they studied did have the similar kind of restrictive attitudes towards overt homosexual behavior that ours does."

plaintiff claims that, despite this disagreement among biblical scholars, "it is clear that Biblical law has been advanced as a reason for the enactment of this and similar laws." However, as discussed above, it is impossible to ascribe *any* intent to the legislature in its enactment of § 21.06. See Appendix A.

Therefore, § 21.06 does not violate the establishment clause because there was no proof that "the principal or primary effect of this statute was to advance or inhibit religion." *Harris v. McRae,* 448 U.S. 297, 318–20, 100 S.Ct. 2671, 2688–89, 65 L.Ed.2d 784 (1980).

### abstention

The defendants claim that this Court should "abstain, in order to permit the state courts, or its legislature, to consider this most sensitive matter of state law based on grounds of comity and federalism."

■ This claim is baseless.[60] Neither *Younger* abstention nor *Pullman* abstention is appropriate.[61] See *Red-Bluff Drive-In, Inc. v. Vance,* 648 F.2d 1020, 1032 (5th Cir. 1981). There are no charges pending against plaintiff under § 21.06 *(Younger)*. And, there is no "unsettled question of state law" which might dispose of the case without the need for constitutional adjudication *(Pullman)*. It is clear that the only thing prohibited by § 21.06 is private, consensual homosexual conduct—and that, for the reasons discussed, it violates the plaintiff's right of privacy and his right to equal protection of the law.

### standing

The defendants claim that, since the plaintiff faces no "genuine" or "real" or "credible" threat of prosecution, this action should be dismissed for lack of standing. They base this argument upon the fact that

the plaintiff has never been arrested or threatened with prosecution under § 21.06 —and the fact that there is "no evidence that any person was ever prosecuted anywhere in Texas for consensual adult homosexual conduct in a private residence."

■ This contention, too, is erroneous. The plaintiff does have standing to attack the constitutionality of § 21.06. He faces a direct harm in the form of threatened prosecution since it is stipulated that both defendants "would prosecute the plaintiff and other homosexuals under [§ 21.06] if provable violations of the law come to their attention."

It is not necessary for the plaintiff to expose himself to actual arrest and prosecution in order to challenge § 21.06. *Babbitt v. United Farmworkers,* 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979); *Steffel v. Thompson,* 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974); *High Ol' Times, Inc. v. Busbee,* 621 F.2d 135 (5th Cir.1980). As stated in *Babbitt:*

> "When contesting the constitutionality of a criminal statute, 'it is not necessary that [the plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights.' *Steffel v. Thompson,* 415 U.S. 452, 459 [94 S.Ct. 1209, 1215, 39 L.Ed.2d 505] (1974) . . ." (442 U.S. at 298, 99 S.Ct. at 2308).

Although there may be practical problems in obtaining convictions under § 21.06 (see notes 5, 6), the threat of prosecution is "credible" and "real." For example, participants can be prosecuted if a third person observes their acts of homosexual sodomy. Moreover, § 21.06 can be—and has been— used by the state if there is some doubt as to whether the conduct occurred in a public place (see note 6). The state has certainly not "disavowed any intention" of invoking

---

**60.** It is really a request that the plaintiff be denied relief. There is little likelihood that the Texas legislature will repeal § 21.06 (see Appendix A), and the state courts would certainly uphold the constitutionality of this statute. See Appendix A; *Torme v. State,* 525 S.W.2d 9, 11 (Tex.Cr.App.1975).

**61.** *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Railroad Comm. of Texas v. Pullman,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

the statute in either of these instances. *Babbitt*, 442 U.S. at 302, 99 S.Ct. at 2311.[62]

In addition, it is clear that the plaintiff and other homosexuals suffer other detriments from § 21.06 besides the threat of prosecution and a $200 fine. For example:

(i) Employers are reluctant to hire "criminals," and the testimony of a Dallas School Board member established that prosecution, or even suspicion, of a violation of § 21.06 would have resulted in the termination of plaintiff's employment as a school teacher (see note 9).

(ii) The plaintiff's experts testified that severe anxieties are caused by threat of criminal punishment of homosexual conduct, and that this emotional distress could result in mental disorders. The plaintiff's testimony confirms this.

(iii) As reflected in reported cases, § 21.06 has been the basis (at least in part) for denial of probation in criminal cases, the alleged harassment of patrons of known homosexual bars, the refusal of employment, and the denial of citizenship to aliens.[63]

Accordingly, the plaintiff does have standing to attack the constitutionality of § 21.-06, which makes him a "criminal."

### Conclusion

Homosexuality is an emotional and controversial issue in our society. It causes fear and disgust among many people. This may well result in condemnation of this decision—but, if so, the critics should at least have a clear understanding that this decision has little effect upon the general public.

At issue is a statute which is not enforced by criminal prosecutions; and, even if it were, the only punishment is a fine of $200 or less. But this statute, § 21.06, makes criminals out of more than 700,000 individuals in Texas who are homosexuals, although they did not choose to be, and who engage in private sexual conduct with other consenting adults. This is prohibited by the constitutional right of privacy (as well as equal protection of the law)—because, if it were not, the state would have the same power to intrude into the private lives and bedrooms of heterosexuals, and regulate the intimate sexual relationships of married couples and single males and females.

Of course, this decision does not mean that the Constitution shields *all* types of homosexual conduct or that it "unqualifiedly sanctions personal whim." *Doe v. Commonwealth's Attorney,* 403 F.Supp. at 1204–05 (Merhige, J., dissenting). There is no constitutional protection if force is used, or if a minor is involved, or if the sexual conduct takes place in public, and this is true whether heterosexuals or homosexuals are involved.[64]

Homosexuals, like heterosexuals, are still subject to prosecution—just as they have been for years, *under Texas Penal Code provisions not involved in this case*—for (i) rape and sexual abuse by force, §§ 21.02 and 21.04, (ii) sexual offenses involving children, §§ 21.09–21.11, and (iii) sexual conduct or indecent exposure in a public place, §§ 21.07 and 21.08. See Appendix A.

▇ Nor does this decision mean that all consensual activities in private are constitu-

---

**62.** It is not necessary to address the defendant Wade's baseless, *but imaginative,* argument that there is no standing because § 21.06 "may not ever be enforced against the plaintiff because of a myriad of circumstances under his control, e.g., a change in preference for sexual partners, *a surgical sex change,* or a physical inability to locate a suitable male sexual partner."

**63.** See Appendix A, discussing *Torme v. State* (probation), *Cyr v. Walls* (alleged harassment), *Childers v. Dallas Police Dept.* (refusal of employment), and *Longstaff v. Immigration &*

*Naturalization Service,* 538 F.Supp. 589 (N.D. Tex.1982) (citizenship).

**64.** "Absent is the factor of commercialization with the attendant evils commonly attached to the retailing of sexual pleasures; absent the elements of force or of involvement of minors which might constitute compulsion of unwilling participants or of those too young to make an informed choice; and absent too intrusion on the sensibilities of members of the public, many of whom would be offended by being exposed to the intimacies of others." *New York v. Onofre,* 434 N.Y.S.2d at 952, 415 N.E.2d at 941.

tionally protected, or that an individual has an absolute right to do whatever he pleases in his own home. Obviously, the right of privacy does not apply to private conduct harmful to the individual participants or to society, such as the use of harmful drugs. See *New York v. Onofre,* 434 N.Y.S.2d at 952–53, 415 N.E.2d at 941–42.

But, for the reasons discussed above, the right of privacy does extend to private sexual conduct between consenting adults— whether husband and wife, unmarried males and females, or homosexuals—and the right of equal protection condemns a state statute which (like § 21.06) prohibits homosexual sodomy, but not heterosexual sodomy, without any rational basis.

### APPENDIX A—THE TEXAS SODOMY LAWS

#### 1. *Article 342*

There have been three sodomy statutes in Texas. The first, Article 342 of the Texas Penal Code, was adopted in 1860 (four years after the initial criminal code had been enacted in 1856). It provided:

> "Whoever commits with mankind or beast *the abominable and detestable crime against nature* shall be confined in the penitentiary for not less than five nor more than fifteen years."

Since sodomy was not defined—indeed, "the charge was too horrible to contemplate and too revolting to discuss," *Harvey v. State,* 55 Tex.Cr.R. 199, 115 S.W. 1193 (1909)—Texas courts "looked to the common law for the elements of [this] crime," and surprisingly held that this statute did not condemn oral sex, but only anal sodomy and bestiality. *Pruett v. State,* 463 S.W.2d 191 (Tex.Cr.App.1970). *Prindle v. State,* 31 Tex.Cr.R. 551, 21 S.W. 360 (1893) held:

"... 'Sodomy, which is the abominable and detestable crime against nature known to the common law, is, by article 342 of the Penal Code made an offense' in this state; and, being undefined, we must look to the common law for the elements of this crime. *Ex parte Bergen,* 14 Tex. App. 52. 'To constitute this offense, the act must be in that part where sodomy is usually committed. The act in a child's mouth does not constitute the offense.' 1 Russ.Crime, p. 937; *Rex v. Jacobs, Russ. & R.* 331. . . . However vile and detestable the act [of oral sex] proved may be, and is, it can constitute no offense, because not contemplated by the statute, and is not embraced in the crime of sodomy." (21 S.W. at 361).

Thus, for a period of 83 years in Texas, oral sodomy was not illegal—whether committed by man and wife, by unmarried male and female, or by homosexuals.[1]

#### 2. *Article 524*

In 1943, the sodomy statute was amended to prohibit *all* oral or anal sex, even between persons who were married. Article 524 of the Texas Penal Code then provided:

> "Whoever has carnal copulation with a beast, or in an opening of the body, except sexual parts, with another human being, or whoever shall use his mouth on the sexual parts of another human being for the purpose of having carnal copulation, or who shall voluntarily permit the use of his own sexual parts in a lewd or lascivious manner by any minor, shall be guilty of sodomy, and upon conviction thereof shall be deemed guilty of a felony, and shall be confined in the penitentiary not less than two (2) nor more than fifteen (15) years."[2]

---

1. In 1925, Article 342 and other statutes were inadvertently omitted from the enrolled bill containing the Revised Penal Code of 1925. In *Ex parte Copeland,* 91 S.W.2d 700 (Tex.Cr.App. 1936), Judge Christian held that this did not repeal the sodomy laws:

   "To impute to the Legislature the intent to repeal the statutes defining incest, bigamy, seduction, adultery, and fornication is to lay at its door the charge of ignoring the moral sense of the people of this state and striking down some of the strongest safeguards of the home. That such was not the legislative intent is apparent from the enrolled bill."

2. Although "sodomy" could be accomplished "only through the anus and not through the mouth," *Prindle v. State,* 31 Tex.Cr.R. 551, 21 S.W. 360, "carnal copulation" was construed to

For the next 31 years, it would be a felony for *anyone* in Texas—married couples, single males and females, male homosexuals or lesbians—to engage in oral or anal sodomy even in private with another consenting adult.[3]

Although sodomy had been "too horrible to contemplate and too revolting to discuss" in 1909, *Harvey v. State,* 55 Tex.Cr.R. 199, 115 S.W. 1193, times had changed by 1971, and *Pruett v. State,* 463 S.W.2d 191 (Tex. Cr.App.1971), dism'd for want of substantial federal question, 402 U.S. 902, 91 S.Ct. 1379, 28 L.Ed.2d 643 (1971), gave this comprehensive definition:

> "In its broadest meaning, *sodomy* is the carnal copulation by human beings with each other against nature, or with a beast, in which sense it includes the crime against nature, *bestiality* (copulation between a human being and a brute of the opposite sex); *buggery* (carnal copulation of a man with beast); *cunnilingus* (the sex perversion committed with the mouth and the female sexual organ); and *fellatio* (an offense committed with the male organ and the mouth). In its narrower sense, *sodomy* is the carnal copulation between two human beings per anus, or by a human being in any manner with a beast. 81 C.J.S. Sodomy § 1(a), 367." (463 S.W.2d at 195).[4]

Article 524 was declared unconstitutional in *Buchanan v. Batchelor,* 308 F.Supp. 729 (N.D.Tex.1970), reversed on other grounds, 401 U.S. 989, 91 S.Ct. 1222, 28 L.Ed.2d 526 (1971), by a three-judge panel because the statute prohibited the private, consensual acts of married couples, and thus violated their constitutional right of privacy. However, the Texas Court of Criminal Appeals refused to follow this decision—which was remanded to the district court for a determination of whether *Younger* abstention was proper (401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669)—and continued to uphold the constitutionality of Article 524. *Pruett v. State,* 463 S.W.2d 191 (Tex.Cr.App.1971), dism'd for want of substantial federal question, 402 U.S. 902, 91 S.Ct. 1379, 28 L.Ed.2d 643 (1971); *Buchanan v. State,* 471 S.W.2d 401 (Tex.Cr.App.1971), *cert. denied,* 405 U.S. 930, 92 S.Ct. 984, 30 L.Ed.2d 804 (1971).

Another federal district court in Texas also refused to follow the *Buchanan* decision. In *Dawson v. Vance,* 329 F.Supp. 1320 (S.D.Tex.1971), the case was dismissed—on *Younger* abstention grounds as to the homosexual plaintiff seeking to enjoin pending sodomy charges in the state court; on "no case or controversy" grounds as to the married couple who intervened, but who had not been threatened with prosecution under Article 524.[5] However, the court left no doubt that it *would not* extend the right of privacy to private consensual acts of sodomy:

> "The state statute in question, Article 524, Texas Penal Code, forbids and condemns the practice of sodomy. Sodomy is an act upon or concerning the physical being of a person. It is an act of immemorial anathema both at common law, wherein it was punishable by death, 81 C.J.S.Sodomy § 1, p. 370, and in ancient times. Genesis 19: 1–29. It is clearly an

---

cover both oral and anal sex. *Furstonburg v. State,* 148 Tex.Cr.R. 638, 190 S.W.2d 362 (1945).

3. "There are cases which say that it is *conceivable* that a husband and wife would be convicted of sodomy even though the proof established consent, and that it is the unnatural and prohibited ways of satisfying sexual desires that the statute is designed to prevent. Thus husband and wife, if violating this statute, could undoubtedly be punished, *whereas the normal sexual act would not only be legal but perhaps entirely proper*" *Pruett v. State,* 463 S.W.2d at 193, quoting *State v. Nelson,* 199 Minn. 86, 271 N.W. 114 (1937).

4. In 1980, a Texas Monthly article described it more succinctly: "a sexual technique that sounded both anatomically exacting and excruciatingly painful." Texas Monthly, p. 109 (defendant Wade's exh. 1).

5. The court even seemed to have some doubt as to whether the married couple had committed sodomy: in their petition, they "purport to admit to acts of sodomy committed within their alleged marital union. These allegations in the form of admissions are conclusionary in nature" (329 F.Supp. at 1323). But see *Quinonez v. National Ass'n of Securities Dealers, Inc.,* 540 F.2d 824 (5th Cir.1976).

offense involving moral turpitude whether defined by common law or by statute. The practice is inherently inimical to the general integrity of the human person. *This is a postulate not of dogma but of common knowledge. It warrants the dignity of judicial knowledge.* The primary authority and responsibility of the several states to forbid and control otherwise natural libidinal vice could scarcely be questioned. Their primary power over aberrational libidinal vice is no less sure. Sodomy is, therefore, in the general sense a crime the control of which is clearly within the reserved and police powers of the several states...." (329 F.Supp. at 1322) (emphasis added).

### 3. Section 21.06

In January of 1974, a new penal code was enacted—the first comprehensive reform of the state's criminal laws since the initial code had been enacted in 1856. As part of this general reform, the laws concerning sexual offenses were substantially revised. Fornication, adultery, and seduction on promise of marriage were no longer crimes. And, all penalties for sodomy between consenting adults of the opposite sex in private were repealed—so, for the past 8 years in Texas, only homosexuals have been prohibited from engaging in private, consensual sodomy.[6]

Article 524 (Sodomy) was replaced with § 21.06 (Homosexual Conduct), which condemned only oral or anal sex between consenting adults of the same sex:

"A person commits an offense if he [or she] engages in deviate sexual intercourse with another individual of the same sex.

"'Deviate sexual intercourse' means any contact between any part of the genitals of one person and the mouth or anus of another person."

Punishment was drastically reduced, from a felony (2–15 years imprisonment) to a Class C misdemeanor (fine not to exceed $200). Searcy and Patterson, Practice Commentaries to Chapter 21—Sexual Offenses, Texas Penal Code Ann. §§ 21.01–21.12 (Vernon 1974).

No legislative history is available to assist this Court in determining the intent of the legislature in passing § 21.06—i.e., why penalties for oral and anal sodomy between males and females were repealed, but those against private and consensual homosexual conduct were retained. The Court asked the parties to supply legislative history, and the defendant Wade furnished this information:

"The Attorney General's Office in Austin assisted in responding to the Court's request and advised that no readily available data exists as to the legislative history of Section 21.06. It was explained that the state procedure, unlike the procedure attending Acts of Congress, does not involve either the preparation or filing of a 'legislative history' as to any bill. Neither the committee debates nor reports are recorded. A bill [is] usually referred to the Legislature with a one-page report of transmittal.

"Tapes of the 1974 Penal Code revision are on file in Austin, but are flawed by the absence of an index, by the sheer quantum and by the belief by the staff at the state library having custody thereof that the likelihood of locating any such legislative history as to Section 21.06 is remote, at best. The University of Texas Law School Library has a good many of the papers prepared incident to the Penal Code, but this option has the same flaws associated with the tapes, coupled with the uncertainty that these papers could

---

**6.** The plaintiff's requests for admissions asked the defendants to concede that § 21.06 "prohibits a male from engaging in 'deviate sexual intercourse' with another male, but does not prevent such conduct if performed with a female." The response, with an unfortunate but Classic Typo:

"Section 21.06 proscribes a *mole* engaging in 'deviate sexual intercourse' with another

*mole* and likewise proscribes a female engaging in 'deviate sexual intercourse' with another female. The definition of 'deviate sexual intercourse' is not limited to conduct between persons of the same sex."

See *et cetera,* "Somewhat Great Moments in the Law," Dallas Bar Headnotes (July 1982).

be imputed to the Legislature as its declaration of interest." (Defendant Wade's post-trial brief, p. 23.)

A similar description of the lack of legislative history for § 21.06 appears in Von Beigel, The Criminalization of Private Homosexual Acts: A Jurisprudential Case Study of a Decision by the Texas Bar Penal Code Revision Committee, 6 Human Rights 23 (1977). However, this article also states that, although the author had not examined the available tape recordings at any great length "other research indicates that the Penal Code Revision Subcommittee of the House Committee on Criminal Jurisprudence *did* seriously consider the decriminalization of the private homosexual acts of consenting adults, but decided to support § 21.06 as proposed, *fearing a backlash effect against the entire Penal Code should such acts be decriminalized.*"

Actually, the legislature did not prohibit *all* homosexual conduct by § 21.06. That statute condemned only contact between the genitals of one person and the mouth or anus of another of the same sex. Thus, § 21.06 does not prohibit homosexuals from kissing, hugging, or sexually stimulating their partners with hands and fingers. Nor did § 21.06 *condemn* the use of any artificial device—such as a vibrator or dildo—until amended in 1981 to prohibit "the penetration of the genitals or the anus of another with an object." Texas Penal Code Ann. § 21.06 (Vernon Supp.1982).

The revised penal code does prohibit both heterosexual and homosexual rape, § 21.02 (Rape) and § 21.04 (Sexual Abuse) . . . sexual conduct in public by both homosexuals and heterosexuals, § 21.07 (Public Lewdness) and § 21.08 (Indecent Exposure) . . . and both heterosexual and homosexual offenses involving children, § 21.09 (Rape of a Child), § 21.10 (Sexual Abuse of a Child), and § 21.11 (Indecency with a Child). However, the code does contain some puzzling inconsistencies:

(i) Acts involving "contact between the person's mouth or genitals and the anus or genitals of an animal or fowl" are prohibited only if they occur "in a public place, § 21.07 (Public Lewdness). No section condemns such conduct in private. Thus, one may engage in private sexual acts of bestiality—but not in private oral or anal sex with a consenting adult of the same sex, § 21.06 (Homosexual Conduct).

(ii) It is a defense to the statutory rape of a child under 17 if the defendant is "not more than two years older than the victim," but there was no such defense to indecency with a child (§ 21.11) until this was added by amendment in 1981. Thus, for a period of seven years after 1974, a 17-year-old boy could have been prosecuted as a felon "for fondling a 16-year-old girl at her invitation in private, but not for engaging in sexual intercourse with her." Tex.Penal Code Ann. § 21.11 (Practice Commentary) (Vernon 1974 and Supp.1982).

In the 1975 session of the Texas legislature, a bill was introduced to repeal § 21.06. It was defeated in the House of Representatives by a vote of 112–16.[7] Unsuccessful efforts were also made to repeal § 21.06 in the 1977 and 1979 sessions, but no attempt was made in 1981. The plaintiff, Donald Baker, participated in the 1979 effort, but the bill "did not even get out of committee." He testified that, in his opinion, any attempt to repeal § 21.06 in 1983 would fail because most legislators do not want to commit "political suicide by voting for queers."

Although there has been no constitutional attack upon § 21.06, it has been involved in several reported cases. Two were state cases. Three were decisions by other federal judges in this district; none of these involved a direct challenge to the constitu-

---

**7.** The plaintiff, by Motion to Reopen the Evidence and Take Judicial Notice of Legislative History, asked this Court to take judicial notice of "an approximate transcript" of the hearing held on this 1975 bill. This "approximate transcript" indicates that some legislators found the bill and homosexuals distasteful. However, except for the vote on the bill, this Court has refused to take judicial notice because the "approximate transcript" is merely a copy of unofficial notes taken by some unidentified person.

tionality of § 21.06, although one judge reached a different conclusion about the effect of the summary affirmance by the Supreme Court in *Doe v. Commonwealth's Attorney.*

In *Torme v. State,* 525 S.W.2d 9 (Tex. Crim.App.1975), the defendant's parole was revoked because of an act of homosexual rape, but the court also noted that the evidence clearly reflected a violation of § 21.06. And, in *Head v. Newton,* 596 S.W.2d 209 (Tex.Civ.App.—Houston 1980), the court held it was still "slanderous per se" to call someone a "queer," because "it imputes the crime of sodomy" under § 21.-06.

*Cyr v. Walls,* 439 F.Supp. 697 (N.D.Tex. 1977) involved a class action brought "on behalf of all gay persons in the City of Fort Worth" to enjoin alleged surveillance and harassment by city police. In deciding the class issues, *Judge Mahon* stated in dicta that "there can be no doubt that such state sodomy and homosexuality laws [like § 21.-06] are constitutional," citing *Doe v. Commonwealth's Attorney,* 403 F.Supp. 1199 (439 F.Supp. at 701). However, it was not necessary for Judge Mahon to analyze or decide this issue—because, as he emphasized, the plaintiffs were not seeking relief from any conduct condemned by § 21.06, but for protection from alleged police harassment while they were "engaged in lawful activities of peaceful assembly and association." Judge Mahon did not decide the merits of these claims, but certified classes limited to those persons who were in attendance at regularly scheduled meetings of a gay rights organization, the services of a gay church, and certain named gay bars.

*In re Longstaff,* 538 F.Supp. 589 (N.D. Tex.1982), *appeal pending,* involved a naturalization petition. *Judge Estes* held that the plaintiff, an admitted homosexual, had not been "lawfully admitted to the United States," 8 U.S.C. § 1427(a), because he had committed sodomy in England and, therefore, was a "psychopathic personality."[8] Judge Estes also held that the plaintiff had not sustained the burden of proving his "good moral character" as required by 8 U.S.C. § 1427(e) because, *among other reasons,* he had engaged in violations of § 21.06, the Texas sodomy statute. Judge Estes recognized that this decision was inconsistent with *Nemetz v. Immigration & Naturalization Service,* 647 F.2d 432 (4th Cir.1981)—but, more importantly, he was not faced with any direct constitutional attack upon the validity of § 21.06, as in this case.

Finally, in *Childers v. Dallas Police Department,* 513 F.Supp. 134 (N.D.Tex.1981), affirmed without opinion, 669 F.2d 732 (5th Cir.1982), a homosexual brought suit because he was not hired by the Dallas Police Department.[9] He raised a number of claims; among these was the assertion that the right of privacy extended to private homosexual conduct and that Police Department's refusal to hire him violated this right. But *Judge Porter* made it clear that he was not faced with any challenge to the constitutionality of § 21.06. He emphasized that "this is not a case where such solitude [for the right of privacy] is appropriate. The situation here is not one where the State is seeking to use its criminal processes to coerce persons to comply with the moral judgments of the majority." And, Judge Porter denied relief in *Childers*

**8.** But see *Lesbian/Gay Freedom Day Committee, Inc. v. Immigration & Naturalization Service,* 541 F.Supp. 569 (N.D.Cal.1982), which— based upon "the preponderance of medical evidence that homosexuality is not a mental disease, disorder or psychopathic personality trait"—held that (i) the INS policy of per se exclusion of homosexual aliens from entry into the United States violates the first amendment, and (ii) that any exclusion of a homosexual alien from entry based upon his "sexual deviation" must be accompanied by medical certifi-

cation that he is afflicted "with excludable physical or mental defect."

**9.** The Code of Conduct of the Dallas Police Department "makes any violation of federal or state statutes a ground for discharge or disciplinary action," prohibits "cohabitation with a sex pervert of the same sex," and condemns "any conduct which, if brought to the attention of the public, could result in unfavorable criticism of the employee or the Police Department." *Childers v. Dallas Police Dept.*

because he concluded that the "police department's actions [in refusing to hire a homosexual] were rationally related to a legitimate government end," and that "the government's interests far outweigh any interest Childers had in constitutional protection for his homosexual behavior."

"... There are a myriad of grounds upon which the police departments actions and the regulations upon which those actions were based may be found appropriate for the full and efficient accomplishment of the police department's mission. The regulation serve to protect the integrity of the police department and to maintain discipline. There is legitimate concern about tension between known and active homosexuals and others who detest homosexuals. There are also legitimate doubts about a homosexual's ability to gain the trust and respect of the personnel with whom he works. Moreover, the police department could rationally conclude that tolerance of homosexual conduct might be construed as tacit approval, rendering the police department subject to approbation and causing interference with the effective performance of its function."

*See Beller v. Middendorf,* 632 F.2d 788 (9th Cir.1980); *Webster v. Redmond,* 599 F.2d 793 (7th Cir.1979), *cert. denied,* 444 U.S. 1039, 100 S.Ct. 712, 62 L.Ed.2d 674 (1980).

In his *Childers* opinion, Judge Porter stated that the summary affirmance in *Doe v. Commonwealth's Attorney,* 403 F.Supp. 1199, (E.D.Va.1975), *affirmed without opinion,* 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976), "seems to imply that homosexual conduct does not enjoy special constitutional protection under the due process clause." He briefly considered *Carey v. Population Services,* 431 U.S. 678, 688 n. 5, 97 S.Ct. 2010, 2018 n. 5, 52 L.Ed.2d 675, but noted that "without an authoritative Supreme Court holding to the contrary, the Supreme Court ruling in *Doe,* though summary, is binding on this Court under the rule of *Hicks v. Miranda,* 422 U.S. 332 [95 S.Ct. 2281, 45 L.Ed.2d 223] (1975)." This opinion reaches a different conclusion because of the detailed analysis presented on pages 29–32. In addition:

(i) Although Judge Porter briefly dismissed *Carey* as a plurality opinion, he did not refer to the fact that six Justices agreed that the summary affirmance in *Commonwealth's Attorney* did not definitively answer the difficult question of whether the right of privacy extends to private sexual conduct between consenting adults (431 U.S. at 688, 97 S.Ct. at 2018); and

(ii) Judge Porter's decision in *Childers* was rendered (March 30, 1981) before the Supreme Court had denied certiorari in *New York v. Onofre,* [51 N.Y.2d 476], 434 N.Y.S.2d 947 [45 N.E.2d 936] (May 18, 1981).

Finally, there was no direct "equal protection" attack upon § 21.06 in *Childers,* as there is in this case.[10] And, as discussed above, even if this Court is not correct about the effect of the Supreme Court's summary affirmance in *Commonwealth's Attorney* on the "right of privacy issue," this does not affect the decision that § 21.06 violates the equal protection rights of the plaintiff by discriminating against homosexuals without any rational basis.

---

**10.** Judge Porter did conclude that the Dallas Police Department's regulations were reasonably related to a legitimate government end, and, therefore, did not deny the plaintiff equal protection of the law. However, this analysis (note 22) concerned the regulations and "the treatment received by other violators of the law" (such as occasional marijuana smokers, note 19), and did not consider the discrimination between homosexuals and heterosexuals under § 21.06.